### JACOBSON v. CHICAGO, M., ST. P. & P. R. CO.
### No. 9544.

Circuit Court of Appeals, Eighth Circuit.
July 26, 1933.

Edward J. Callahan, of Minneapolis, Minn. (Smith, Callahan & Carlson, of Minneapolis, Minn., on the brief), for appellant.

A. C. Erdall, of Minneapolis, Minn. (F. W. Root and C. O. Newcomb, both of Minneapolis, Minn., and C. S. Jefferson, of Chicago, Ill., on the brief), for appellee.

Before KENYON and GARDNER, Circuit Judges, and DEWEY, District Judge.

GARDNER, Circuit Judge.

Appellant, as plaintiff below, brought this action to recover damages for personal injuries suffered by him as the result of being struck by a snowplow which was being operated by appellee at the head end of a locomotive. For convenience the parties will be referred to as they appeared below.

At the close of all the evidence, defendant interposed a motion that the case be dismissed on the merits, or, in the alternative, that the court direct a verdict in its favor on the ground that plaintiff had failed to show any actionable negligence on the part of defendant. This motion was granted by the court, and a judgment of dismissal on the merits was accordingly entered, and this action of the court is the controlling issue on this appeal.

The evidence, resolving all conflicts in favor of plaintiff, shows substantially the following facts:

Plaintiff was an experienced section laborer, having been employed in that capacity by defendant for a period of some twelve years prior to the accident. For three years prior to the accident he was employed on the Winnifred branch line on which there was operated a scheduled mixed freight and passenger train on Mondays, Wednesdays, and Fridays. The section foreman called the dispatcher every morning to find out if there would be an extra train on that day, and whether or not it was late.

On the day before the accident, the foreman, with the knowledge of plaintiff, went to Lewistown, and was not in the performance of his usual duties on the day of the accident. But on the previous day he told plaintiff that there would be no trains on the following day (the day of the accident). While this is disputed by the section foreman, yet, for the purposes of a motion for directed verdict, the testimony of plaintiff must be accepted as true.

It appears from the evidence that the dispatcher seldom knew about what extra trains would be operated the following day, because extra trains are sometimes called out on very short notice, and, when snowplows return to the terminals, they are sometimes sent out on the lines as soon as a crew is available.

On February 28, 1929, plaintiff went out on this Winnifred branch line to do certain track work. He cleaned the three crossings from Moulton to Christina, and, as he was walking west from crossing No. 3 toward crossing No. 4, on the right side of the track looking for broken rails, at a point two or three hundred feet west of crossing No. 3, he was struck by a train coming from behind, traveling in the same direction as he was, and made up of a gondola car, on the front end of which was bolted a wedge snowplow, and this car, being loaded down with gravel as ballast, was fastened to the head of the engine by an automatic coupler and chains, which were wired, so that they could not become unhooked. At the rear of the locomotive was a caboose, and at the rear end of the caboose was a flanger car, which is a box car with an apparatus under the center of the car which can be raised and lowered to clean out the inside of the rails. Plaintiff testified that he did not hear any whistle blown nor bell rung. There was a strong wind blowing and some snow drifting, and the snowplow encountered drifts of snow so that snow was thrown up in front of the engine and caboose. From 3 to 5 feet of snow was piled up on top of the gondola car and covered to a considerable degree the windows of the engine and caboose, so that the train men were unaware that they had struck plaintiff until the train had passed him.

Plaintiff was aware that the defendant ran snowplows over the track when there

were snowdrifts on the track, and two days before the accident he and the section foreman ran into a drift of snow and ice, which was about 2 feet deep, at a point about one-half mile west of Moulton. On the day of the accident, and on the preceding day, the wind was blowing and the snow drifting, and on the day before the accident the scheduled train was stuck for an hour and thirty-five minutes in the snow about 5½ miles north or west of Christina. The section foreman took this belated train to Lewistown.

From August 7, 1928, to February 28, 1929, there were sixteen extra trains operated over this branch line on Tuesdays, Thursdays, and Saturdays, and plaintiff worked eight hours on each of these days. Extra trains in midwinter were mostly snowplow trains, and their running depended upon the weather. Defendant's rule 18, with which plaintiff was familiar, provided: "When a line up of train movements is obtained it must not be considered final because operating conditions may require running of additional trains."

Plaintiff had been instructed to keep a lookout for trains.

After the section foreman arrived in Lewistown, and about midnight of February 27th, he learned that there might be a snowplow run over the Winnifred line the following day. He did not attempt to warn plaintiff, who was then at Christina, Mont., which was the headquarters of both the section foreman and plaintiff. Christina consisted of a store, post office, elevator, and a small railroad station. There was a one-way telephone, by means of which one could call the dispatcher from Christina, but the dispatcher could not call Christina because there was no bell on the telephone at Christina. There was no agent in the depot at Christina, and plaintiff lived at the time in a bunkhouse located about 800 feet south of the depot. There was no telephone in the bunkhouse, nor was there any telephone in the section house.

At the time of the accident, plaintiff was walking on the right side of the track, facing a strong wind. At crossings Nos. 1 and 3 there were only four planks, or a plank on each side of the rail of the track. At crossings Nos. 2, 4, and 5 there were six planks, and the space between the rails was covered by two planks, and one plank was placed on the outside of each rail. There were whistling posts for the public crossings. Crossings Nos. 2, 4, and 5 were public crossings, while crossings Nos. 1 and 3 were farm crossings. At crossings 1 and 3 there were no highway crossing signs and no whistling posts, except the flanger whistling posts. Crossing No. 3 is located on a sharp curve. Between Moulton and the curve the track ran northeast, and beyond or north of the curve the track ran northwest. Plaintiff had cleaned out crossings Nos. 2 and 3 before the accident. A farmer and his son living between crossings Nos. 2 and 3 testified that they heard the train whistle for both crossings 2 and 3; that the train looked like a snowball; that the snow was flying around it, and it was plastered all over with snow. The train crew testified that the crossing whistles were all regularly given, and that the engine bell was rung automatically, and that it was ringing at the time of the accident, having been turned on before reaching Moulton and not turned off until after the accident occurred. The flanger, which was being operated on the train at the time of the accident, must be raised at all planked crossings, or otherwise it would tear up the crossings and probably cause a wreck. The flanger whistle signal was given at crossings 2 and 3, and the flanger raised for those crossings, and no damage was done thereto.

There was a snowdrift about 200 feet in length on the curve just before the train reached crossing No. 3, and the drift extended onto that crossing, and this snowdrift was encountered as the train went around this curve and passed the crossing. No one on the train saw Jacobson before he was struck. Plaintiff was wearing a sheep-lined coat, with a collar which extended to the top of his ears. He was wearing a cap which could be pulled down over his ears. When he was picked up after the accident, his coat was buttoned up and the collar turned up over his ears, and he was unconscious, having suffered a serious fracture of the skull and a fracture of both bones of the right leg. Plaintiff claims that his coat collar was not turned up over his ears at the time of the accident, but that after he was struck he turned his coat collar up over his ears.

Defendant's rule 103 provides: "When cars are pushed by an engine, except when shifting or making up trains in yards, a trainman must take a conspicuous position on the front of the leading car."

Another rule of defendant provides that the highway crossing whistle signal should be sounded at obscure places on irregular and delayed trains.

■ The liability of the defendant must be determined under the provisions of the Fed-

eral Employers' Liability Act (45 USCA §§ 51–59). Under that act negligence is the basis of liability, and there can be no recovery in the absence of common-law negligence on the part of the railroad company, or some of its employees. Toledo, St. L. & W. R. Co. v. Allen, 276 U. S. 165, 48 S. Ct. 215, 72 L. Ed. 513; Missouri Pacific R. Co. v. Aeby, 275 U. S. 426, 48 S. Ct. 177, 72 L. Ed. 351; Nelson v. Southern R. Co., 246 U. S. 253, 38 S. Ct. 233, 62 L. Ed. 699; Chicago & N. W. R. Co. v. Bower, 241 U. S. 470, 36 S. Ct. 624, 60 L. Ed. 1107; Southern R. Co. v. Gray, 241 U. S. 333, 36 S. Ct. 558, 60 L. Ed. 1030; Seaboard Air Line Ry. v. Horton, 233 U. S. 492, 34 S. Ct. 635, 58 L. Ed. 1062, L. R. A. 1915C, 1, Ann. Cas. 1915B, 475.

Accepting this rule as determining his right to recover, plaintiff on this appeal contends that the evidence was such as to entitle him to go to the jury upon an issue of negligence raised (1) by the testimony as to the assurance given to plaintiff by defendant's section foreman that there would be no trains operated on the day of the accident; (2) by the testimony showing that defendant operated a gondola plow, which was a dangerous instrumentality, and violative of its general rule 103; and (3) by the testimony that plaintiff heard no whistle or bell at crossing No. 3, and his testimony that no whistle was sounded. It is also contended that the action was improperly removed from the state court and that the federal court was without jurisdiction.

■ Plaintiff was an experienced section laborer upon defendant's railroad. It was his duty to go over and examine the track, and to assist in keeping it in repair. At the time of receiving his injuries, he was, in fact, inspecting the track particularly for broken rails. A rule of the company, with which he was very familiar, specifically made it his duty to look out for trains at all times, and he had been instructed by his foreman, according to his own testimony, to "look out, train or not train, always." Generally speaking, a section man must of necessity rely upon his own vigilance and protect himself from injury by engines or trains operated upon the track where he is employed. It is his duty to keep a lookout for such engines and trains, rather than the duty of those in charge of such engines and trains to keep a lookout for him, or give him any warning, unless, of course, he is seen in a position of danger. Chesapeake & Ohio R. Co. v. Nixon, 271 U. S. 218, 46 S. Ct. 495, 70 L. Ed. 914; Aerkfetz v. Humphreys, 145 U. S. 418, 12 S.

Ct. 835, 36 L. Ed. 758; Kansas & A. V. R. Co. v. Dye (C. C. A. 8) 70 F. 24; Norfolk & W. R. Co. v. Gesswine (C. C. A. 6) 144 F. 56; Biernacki v. Pennsylvania R. Co. (C. C. A. 2) 45 F.(2d) 677; Carfelo v. Delaware, L. & W. R. Co. (C. C. A. 2) 54 F.(2d) 475; Connelley v. Pennsylvania R. Co. (C. C. A. 3) 201 F. 54, 47 L. R. A. (N. S.) 867; Olson v. St. Paul, M. & M. Ry. Co., 38 Minn. 117, 35 N. W. 866; Larson v. St. Paul, M. & M. Ry. Co., 43 Minn. 423, 45 N. W. 722.

In Chesapeake & Ohio R. Co. v. Nixon, supra, Mr. Justice Holmes, holding that a section foreman had assumed the risk of being struck by a train while inspecting the track, said: " * * * He must rely upon his own watchfulness and keep out of the way. The Railroad Company was entitled to expect that self-protection from its employees."

■ It is, however, claimed by plaintiff that he was relieved from this duty because the section foreman had advised him on the day previous to the accident that there would be no trains. This testimony is claimed to be based upon a practice of the section foreman to call the dispatcher every morning and give report to the plaintiff as to the trains for the day. There was, however, no custom or practice of reporting what, if any, trains might be operated the following day, and it is observed that the conversation referred to was in connection with the anticipated absence of the section foreman from his section on February 28th. In referring to his contemplated trip to Lewistown, he told the plaintiff that there would be no trains the next day. The plaintiff then knew, however, that this report, if made, was not based upon the practice to which he testified, because it was not confined to the day on which the foreman called the dispatcher's office. According to plaintiff's testimony, the section foreman said to him: "Tomorrow there is no train, and I got a letter. I going to attend the foreman meeting." This may well have been a simple recital that there were no trains scheduled for the following day, but, if it was intended to go further than that it was at most, as plaintiff knew, a mere prophecy. The section foreman had no control over the operation of extra trains; he did not know, and had no means of knowing, whether an extra train or snowplow might be run the following day. Certainly, positive assurance that such a train would not be run on the following day, in view of the prevailing conditions, could not have been given, and plaintiff knew that no such reliable information

could then possibly be available. Track conditions and weather conditions, as shown by the undisputed evidence, determined or largely influenced the operation of such equipment as was run on the day of plaintiff's injury. Rule 18 required him to expect the running of additional trains, even though the lineup indicated no train, and plaintiff knew that track conditions were such that the operation of snowplow equipment was essential to maintaining the track in condition for the operation of trains. The section foreman at midnight on February 27th, while he was at Lewistown, learned that this equipment would be operated, and it is urged that it was incumbent upon the company to notify plaintiff of such change in its operating plans. As has already been observed, there were no established means of communicating with plaintiff, and it was his duty at all times to keep a lookout for trains, and "the Railroad Company was entitled to expect that self-protection from its employees."

In Shepard v. B. & M. R. R., 158 Mass. 174, 33 N. E. 508, 509, in an opinion by Judge Holmes, later Mr. Justice Holmes of the Supreme Court, it appeared that a motorcar operated by a section foreman came in collision with a wild train, injuring one of the section laborers riding on the motorcar. In the course of the opinion it is said: "It is said that the wild train might have telegraphed. But there was nothing in the rules which gave any one a right to expect that, and the jury would not have been warranted in finding that the defendant owed the plaintiff any duty to do so."

As has been observed, this train, as it approached plaintiff, passed through snowdrifts enveloping the train in snow, so that the view of those in charge of the train was obstructed. Plaintiff, however, was walking on a straight track, and his view, had he looked, was unobstructed. He was already on the outside of the rail, and one step to the right would have removed him from all danger.

We conclude that plaintiff's contention that defendant was negligent in not warning him that an extra train was to run is not sustained by any substantial evidence, and that this hazard was one which plaintiff assumed as an incident to his employment.

It is next urged that defendant was negligent in running a gondola car with a snowplow attached to it in front of its engine, in violation of rule 103. The lower court was of the view that the rule was not applicable to a snowplow, and that it had never been considered as applicable to such equipment. One thing certain, a man could not have been stationed on this gondola car when it was being used as a part of the snowplow. There is no allegation in the complaint that the equipment was not proper, but the negligence alleged was the failure to have a man stationed on the front end of the gondola snowplow car. Defendant's rule 103 provides that: "When cars are pushed by an engine, except when shifting or making up trains in yards, a trainman must take a conspicuous position on the front of the leading car."

This gondola car, loaded with ballast, was attached to the head end of the engine, not only by the coupler, but by chains, and the chains were wired. A man could not have been stationed on the front of this snowplow when running through snowdrifts, and it appears that at the time of the accident there were 4 or 5 feet of snow piled on top of the gondola car. There was testimony, which was undisputed, that rule 103 was not applicable to a gondola snow car, which was considered a part of the engine. The testimony shows that the snowplow car was considered an extended pilot. Certainly, if a man had been stationed on the front of this gondola snowplow, it would not have prevented this accident, as he would either have been killed or buried under an avalanche of snow before the accident occurred, so that, if it was negligence to fail to post a man on this car, such negligence was not the proximate cause of the accident, and hence would not entitle plaintiff to recover, nor to go to the jury on that issue.

A rule of the company provided that: "The highway crossing whistle signal will be sounded at obscure places on irregular and delayed trains," etc.

It is urged that the defendant was negligent in having failed to give the whistle signal at crossing No. 3. Crossing No. 3 was not a public crossing, but the evidence indicates that it was located at an obscure place, and for that reason the defendant, in the exercise of proper care, should have sounded its whistle at this place. It is the contention of the defendant that it gave the proper signal, although it contends the rule was not in the interest of the plaintiff, but in the interest of those who might properly be using the crossing. So far as the rule has reference to a crossing, this contention is doubtless correct, but the rule also requires that the signal

be given at all obscure places, and, manifestly, this must have contemplated the giving of a whistling signal at obscure places in the interest of those who might properly be upon the track at such places.

The lower court held that there was no substantial evidence that the whistling signal had not been given, although the plaintiff testified that he did not hear such a signal. While this testimony is negative, yet, if the conditions and circumstances were such that he should have heard the whistle if sounded, then his testimony would be sufficient to raise a substantial conflict in the evidence. The positive testimony of the engineer, fireman, conductor, two brakemen, a roadmaster, an extra foreman, and two farmers was to the effect that the whistle was blown. It has been observed that a flanger car was being operated as a part of this train equipment. The flanger is a steel blade which fits down over the rails to clear the snow away. Because of the planking at crossings, it must be raised at all crossings. If not so raised, it will wreck the crossing and probably wreck the train. The only method of determining when to raise this device is by whistling signals given by the engineer. The testimony is that the signal for crossing No. 3 was given, and, in addition to that, the physical facts show that the flanger was raised. All of the witnesses for the defendant were in position to have heard the sounding of the whistle, and those in charge of manipulating the flanger were dependent entirely upon the sounding of the whistle as a signal to raise the flanger at the crossing. In the case of the plaintiff, however, as has already been observed, he was walking against a very strong wind estimated to have a velocity of from 30 to 40 miles an hour. The train was traveling behind him and in the same direction. He was not expecting a train, and the wind would certainly tend to blow the sound away from him. But, in addition to this, it appears that, when plaintiff was picked up immediately following the accident, his fur-lined coat was buttoned up and the collar turned up so that it covered his ears. He was unconscious, and had suffered a serious fracture of the skull. Plaintiff testified that, after he was hit, he turned up his coat collar. This testimony is in conflict with the physical facts and scientific principle, and hence is lacking in all probative force. United States v. Harth (C. C. A. 8) 61 F.(2d) 541; United States v. McGill (C. C. A. 8) 56 F. (2d) 522; Ed. S. Michelson, Inc., v. Nebraska Tire & Rubber Co. (C. C. A. 8) 63 F.(2d) 597; Liggett & Myers Tobacco Co. v. De-

Parcq (C. C. A. 8) 66 F.(2d) 678. After being struck by this train in such manner that plaintiff's skull was fractured and his leg broken, it is past belief that he then consciously turned up his coat collar. The physical facts and scientific principle establish that this man's coat was buttoned up and his coat collar turned up over his ears before he was struck by the train. In the circumstances shown in this case, his negative testimony that he did not hear the whistle blow, or that the whistle was not blown, cannot be said to create a conflict in the evidence. He was not in a situation so that he would be likely to have heard the signal had it been given. Chicago & N. W. R. Co. v. Andrews (C. C. A. 8) 130 F. 65; Rich v. Chicago, M. & St. P. R. Co. (C. C. A. 8) 149 F. 79; Franchina v. Chicago, B. & Q. R. Co. (C. C. A. 8) 195 F. 462; Horn v. Baltimore & O. R. Co. (C. C. A. 6) 54 F. 301.

There being no substantial evidence to sustain the contention that defendant was negligent in failing properly to give the signal at crossing No. 3, plaintiff was not entitled to have that issue submitted to the jury.

 It remains to consider the contention that this case was improperly removed from the state court, and that the federal court was therefore without jurisdiction over the parties or the subject-matter. As has been observed, plaintiff set out two causes of action, one bottomed on the Federal Employers' Liability Act, and the other on the Montana statutes. The petition for removal alleges, in addition to the amount in controversy, diversity of citizenship between the parties. Plaintiff made no motion to remand the case to the state court. Federal courts have original jurisdiction in actions for injury to or death of railroad employees under the same conditions that determine their authority in other suits at law, and an action based upon the Federal Employers' Liability Act is manifestly a suit of a civil nature arising under the laws of the United States within the meaning of the Federal Judicial Code (section 24 [28 USCA § 41]), and hence is within the jurisdiction of the federal District Courts. Assuming that the necessary diversity of citizenship exists, plaintiff might in the first instance have brought the action against defendant in the federal court. It cannot, therefore, be said that the court was inherently without jurisdiction to try the action. Actions arising under the Federal Employers' Liability Act, if brought in a state court of competent jurisdiction, are not removable to the federal court. The question

of the removability of a cause of action is ordinarily to be determined by the federal court upon motion to remand. In the instant case, the federal court had jurisdiction notwithstanding the fact that the action may have been improperly removed, a question which we later consider, and the plaintiff failed to move to remand the case. This, we think, was a waiver of plaintiff's right, if he had such, to have the cause tried in the state court. But, quite aside from this conclusion, it is observed that plaintiff pleaded two causes of action. The cause of action based upon the Montana statutes was clearly removable, and, that being true, defendant properly removed the case to the federal court. Lee v. Chesapeake & O. R. Co., 260 U. S. 653, 43 S. Ct. 230, 67 L. Ed. 443; City of Gainesville v. Brown-Crummer Invest. Co., 277 U. S. 54, 48 S. Ct. 454, 72 L. Ed. 781; Strother v. Union Pac. R. Co. (D. C.) 220 F. 731, 733; Flas v. Illinois Cent. R. Co. (D. C.) 229 F. 319.

The question was considered in Strother v. Union Pac. R. Co., supra, where, in a well-considered opinion by Judge Van Valkenburgh, it is said:

"If a cause of action arising under the federal act is coupled with one arising under a state statute or at common law, stated in the alternative in separate counts, the plaintiff preserving the right, under recognized rules of local procedure, to make his election and avail himself of either at the close of the evidence, the right of removal is presented more baldly at the threshold of the case. There is present at the same time a case arising under the federal act, and therefore, standing alone, not removable, and one not arising under that act, and therefore, the citizenship being diverse, admittedly susceptible of being removed. Must the defendant await the action of the plaintiff at the close of the evidence before claiming the right, and, if so, is his relief then clear and complete? The Supreme Court has thus far refrained from settling such procedure, although it has intimated that the defendant should not necessarily be deprived of relief.

"It rests with plaintiff to determine whether he shall state a cause of action solely under the Employers' Liability Act, and therefore incapable of being removed, or whether he may unite with it, in the alternative, a cause of action that may be removed. If he adopts the latter course, does he not subject himself to the exercise of all the rights which a defendant may legitimately claim? Beyond question both causes of ac-

tion are cognizable in the federal court, whether originally brought there or removed by consent. The provision against removal is a privilege granted to the plaintiff, which he may waive. If a cause of action containing all the elements of removability be joined with a count stating a cause of action not originally cognizable in the federal court, nevertheless the defendant may remove the former cause of action, and this will carry the entire case with it."

These views so clearly stated by Judge Van Valkenburgh are in accord with our own, and we conclude that the lower court had jurisdiction to try the action.

The judgment appealed from is therefore affirmed.