## CENTRAL VERMONT RY., Inc., v. SULLIVAN.

### No. 3166.

Circuit Court of Appeals, First Circuit.

Nov. 5, 1936.

George W. Howe, of Boston, Mass. (J. Thomason Phelps, of Boston, Mass., on the brief), for appellant.

William A. O'Hearn (of Getman & O'Hearn), of North Adams, Mass., for appellee.

Before BINGHAM, WILSON, and MORTON, Circuit Judges.

BINGHAM, Circuit · Judge.

This is an action under the Employers' Liability Act of April 22, 1908, c. 149, 35 Stat. 65, as amended by Act of April 5, 1910, c. 143, 36 Stat. 291 (45 U.S.C.A. §§ 51–59), to recover damages for injury and death of the plaintiff's intestate, Patrick Sullivan. The plaintiff is his widow and the duly appointed administratrix of his estate.

At the close of all the evidence the defendant moved for a directed verdict. The District Court did not then pass upon the motion, but specifically reserved the right to do so after the submission of the case to the jury and the return of a verdict. A verdict for the plaintiff having been returned, the court denied the motion and entered judgment on the verdict, from which this appeal was taken. See Baltimore & Carolina Line v. Redman, 295 U. S. 654, 55 S.Ct. 890, 79 L.Ed. 1636.

Patrick Sullivan, at the time of the accident on April 5, 1934, was employed by the defendant as a section foreman, and his injuries and death occurred in interstate commerce.

The section of the track for which Sullivan was responsible as foreman was a single track and ran northerly from one-half mile north of Palmer Station, Mass., to one-half mile north of Barretts Junction, Mass., a total distance of 4½ miles. He had been employed by the defendant on this section since 1909. He was 67 years old, in good health, and his eyesight and hearing were good.

One and one-half miles north of Palmer Station on Sullivan's section was a bridge over the Quaboag river, known as Burleigh bridge. This was an open bridge or trestle 160 feet long and 12 feet wide. The bridge consisted of railroad ties laid on a steel foundation supported by piers and abutments. Two wooden timbers, 6 by 8, known as stringers, ran the length of the bridge on its surface, one on either side, and the distance from the outside of one stringer to the outside of the other was 11 feet and 2 inches, the inside measurement being 9 feet and 10 inches. The approximate width over all of a freight train is 8 feet and 6 inches.

Beginning at a point 796 feet south of and continuing to the bridge, there is a 6-degree curve in the track to the left, and the grade is slightly rising from a point beginning 600 feet south of the southerly end of the bridge.

At 7 o'clock on the morning of April 5, 1934, Sullivan and his son, who was also one of the section crew, went to Barretts Junction, where the defendant's train dispatcher at New London was called on the phone and they were given the line up for the day. The line up, so-called, was a list of trains that, as then known, would be passing over Sullivan's section on that day. From this they learned that Pickup Extra 472, the train that caused the death of Sullivan, was called to leave Palmer at 8 o'clock that morning. A short wait was made at Barretts Junction for another train to pass, and father and son then took a handcar to Three Rivers, north of the bridge, picked up another section hand, and continued south to near the north end of the bridge where the third man was let off. The other two took the car over the bridge and placed it on a switch about 700 feet south of the bridge. Sullivan told his son he was going to inspect his track and started walking south along the track toward Palmer and the point where his section began, the son going back to work with the other section hand north of the bridge.

It was one of the duties of Sullivan to walk the track, including that running over bridges and trestles, along his entire section once each day and examine it. He did not have and was not required to have any regular time for this inspection or to begin the inspection at any regular place, but could and did inspect the track at such times and places as were convenient to him.

He was in the vicinity of the railroad track from the time he left Barretts Junction at about 7 o'clock until he was hit. He must have known that Extra 472 had not passed but was liable to come from the south at any time after 8 o'clock. A person standing on the south end of the bridge, looking south, could see the engine of a train approaching from the south for a distance of 2,066 feet and, if standing on the bridge 46 feet north of its south end, he could see such a train for a distance of 2,112 feet.

At the time of the accident Extra 472 approached the bridge running at about 30 miles an hour. A train running 30 miles an hour would go about 44 feet a second and it would take about three-fourths of a minute for it to travel from a point 2,066 feet south of the bridge to the bridge. A man walking at the rate of 4 miles an

hour would go 270 feet in three-fourths of a minute. This would have given Sullivan ample time to have reached a place of safety if he had seen the train at the point mentioned. If, when being 46 feet upon the bridge, he had seen the train at a point over 300 feet south of the bridge, he would have had seven seconds to retrace his steps and been off the track at the south end of the bridge by the time the train reached there, and would have done this walking only at the rate of 4 miles an hour. If he had hastened his footsteps, he would have been well out of danger.

It thus appears that Sullivan was in no unusually hazardous position which would require the railroad to exercise extra precaution, if they had known he was likely to be there, which they did not.

Was there anything unusual in connection with the running of 472 that morning requiring such precautions on the part of those in the engine of 472?

Extra 472, called to leave Palmer at 8 a. m.—that is, as near 8 as possible—did not leave until after another train, passenger train No. 1, going north, left there at 8:40. It approached the bridge with the engineer, fireman, and head brakeman riding in the engine and hit Sullivan when he was about 46 feet north of the south end of the bridge. It does not appear that the speed (30 miles an hour) was unusual or that the train was being operated in any unusual way.

Evidence was introduced as to the activities of the train crew, train dispatcher, and operators at certain stations and the clearance of trains from the station at Palmer, as to which the plaintiff claims that several rules of the railroad were broken. One of the rules alleged to have been broken and claimed to bear upon the negligence of the road in failing in its duty towards the deceased was rule 91, reading in part as follows:

"91. Unless some form of block signals is used and except when closing up at stations the following intervals must be maintained between trains in the same direction.

"When a station from which a train is to follow and the next station ahead are open train order offices a train must not follow one carrying passengers or operating a snow plow, nor a snow plow or light engine follow any train, until the preceding train has arrived at the station ahead."

Palmer, the station from which train 472 left that morning, and Three Rivers, the next station north, were both open train order offices, and the operators at those stations testified that 472 left Palmer at 8:50, after the operator at Three Rivers had reported to the Palmer operator that train No. 1, a passenger train which had left Palmer at 8:40, had arrived at Three Rivers at 8:45 and left at 8:46. The direct testimony of Ahearn and Hartley, the operators at these two stations, shows that rule 91 was not violated. The indirect evidence that it was is the hospital record showing that Sullivan was admitted to the hospital at Palmer at 9 a. m. and the testimony of the train crew that from the time Sullivan was struck until he was placed in the ambulance at Palmer was some twelve or fifteen minutes. To this must be added the time the train was going from Palmer to the place of accident of about three minutes. There was no evidence from which the time it took the ambulance to go from the station to the hospital could be determined. Disregarding that the jury might have found that train 472 left Palmer at 8:45, five minutes after train No. 1 left, in violation of rule 91.

Furthermore the train register kept at Palmer showed that the particular space, in which operator Ahearn had marked the departure of 472 as of 8:50, included two sets of figures, namely, 8:50 and 10:05, the 10:05 being directly under the 8:50. He testified that the 8:50 showed the time the train (472) left Palmer the first time and 10:05 when it left after the accident. An erasure had been made in the space containing these two sets of figures, which was unexplained.

■ Assuming the rule was broken, it was not made for the protection of Sullivan but for the safe operation of trains. In Norfolk & W. Ry. Co. v. Gesswine (C.C.A.) 144 F. 56, it was shown to have been the custom and obligation of the railroad company to ring the bell and sound the whistle of its trains at railroad crossings and it was claimed that the plaintiff's intestate, a section hand, relied on that custom and was injured on the day of the accident because such warning was not given. The court held that even so the duty to ring the bell and blow the whistle was not one owing the deceased.

■ Although the rules above referred to, including rule 91, were not made for the protection of trackmen or other employees of the road, but for furthering the safety of the railroad's trains in their operation, the plaintiff here claims, as the plaintiff did in Norfolk & W. Ry. Co. v. Gesswine, supra, that the deceased, knowing those rules, had the right to rely upon them and to go upon the bridge in the belief that 472 would not pass over the road so soon after No. 1 had gone by, and he was thereby trapped through the fault of the defendant. This is equivalent to claiming that the defendant, in issuing the rules, although indisputably for the protection of its trains, assured its trackmen that obedience thereto could be depended upon by them and thus a duty was imposed upon it, in respect to such trackmen, to see they were obeyed, a position contrary to the well-settled decisions of the federal courts, which hold that a railroad owes no duty toward its trackmen to look out for them and the burden of their protection from the danger of being hit by passing trains rests upon themselves. Chesapeake & Ohio Ry. Co. v. Nixon, 271 U.S. 218, 46 S. Ct. 495, 70 L.Ed. 914; Toledo, etc., R. R. Co. v. Allen, 276 U.S. 165, 48 S.Ct. 215, 72 L.Ed. 513; Norfolk & W. Ry. Co. v. Gesswine (C.C.A.) 144 F. 56; Thomson v. Downey (C.C.A.) 78 F.(2d) 487; Biernacki v. Pennsylvania R. Co. (C.C.A.) 45 F.(2d) 677.

Cases like Rocco v. Lehigh Valley R. R. Co., 288 U.S. 275, 53 S.Ct. 343, 77 L.Ed. 743, and New York, New Haven & Hartford R. Co. v. Pascucci (C.C.A.) 46 F.(2d) 969, holding a railroad negligent in failing to warn trackmen of an approaching train, do so on a state of facts showing that the railroad company knew or had reason to know of the presence of the men at the place of the accident and that they would be, under the conditions there existing, unable to learn of the approach of the train and protect themselves.

■ It may, however, be claimed that Sullivan was entitled to the benefit of rule 59 requiring ample warning by whistle to a person on the track, bridge, or trestle. This rule has to do with a person seen or known to be on the track in a position of danger. Sullivan, a section man, was not entitled to the benefit of the rule unless he was seasonably seen or known to be on the track or bridge in such position. The rules provided that "employees, in accepting employment, assume its risks"; and "are required to exercise care to avoid injury to themselves and others. They must expect trains to run at any time, on any track, in either direction, and when a train is approaching must stand clear of all running tracks." Here the whistle was blown and Sullivan made aware of the approaching train as soon as he was seen or known to be in a position of danger, and the plaintiff was not entitled to go to the jury on this ground.

■ The only question that remains to be considered is whether the plaintiff introduced sufficient evidence to support the verdict on the ground that there was negligence on the part of the engineer in not stopping the train after Sullivan was seen in a dangerous situation and before he was hit.

The engineer testified that, as the train approached the bridge, he did not and could not see it or any one on it owing to the curve in the track. The head brakeman sat in the front seat on the fireman's side of the engine looking out of the front window of the cab and also back along the train to see that everything was all right. When about 250 to 300 feet south of the bridge the fireman, who had been stoking the engine, took his seat back of the brakeman. At that point and practically at the same time both the fireman and brakeman saw Sullivan on the track and gave notice to the engineer to stop. The engineer shut off steam, blew the whistle, sanded the tracks, and applied the emergency brakes, stopping the front end of the engine, after hitting Sullivan, from 75 to 100 feet north of the bridge, or some 580 feet from the position of the train when Sullivan was first seen. He did not reverse the engine. The plaintiff says this was negligence; that, if he had, the train might have been stopped in season to have avoided the accident. No evidence, however, was introduced to show in how many feet this train which consisted of five loaded freight cars, a caboose, and an engine with its tender, having a total weight of 476 tons and running at 30 miles an hour, could have been stopped if the engine had been reversed, under the conditions there existing. The engineer testified that he made a good stop —there was nothing from which the jury could have found to the contrary.

The District Court erred in denying defendant's motion for a directed verdict and, as a consequence, the judgment ap-

pealed from must be vacated, and judgment entered for the defendant. Baltimore & Carolina Line v. Redman, supra.

The judgment of the District Court is vacated, and judgment is ordered· for the defendant, with costs in this court and in the court below.