## CHICAGO & N. W. RY. CO. v. GARWOOD.

### No. 13637.

Circuit Court of Appeals, Eighth Circuit.

April 28, 1948.

Alfred E. Rietz, of Farmington, Minn. (Lowell Hastings, of Chicago, Ill., on the brief), for appellant.

Irving H. Green, of Minneapolis, Minn. (William A. Tautges, of Minneapolis, Minn., on the brief), for appellee.

Before SANBORN, JOHNSEN, and RIDDICK, Circuit Judges.

RIDDICK, Circuit Judge.

This is an appeal from a judgment entered upon a jury verdict in an action brought under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., to recover damages for injuries sustained by appellee when struck by one of appellant's passenger trains. In the complaint appellant was charged with negligence resulting in appellee's injuries (1) in failing to use reasonable care to furnish appellee a safe place to work, (2) in operating its passenger train at an excessive rate of speed, (3) in failing to keep a lookout for employees of appellant on the track at the point where appellee was working at the time of his injuries, and (4) in failing to warn appellee of the approach of the train which struck him. The defense was a denial of negligence of appellant and the charge that appellee's negligence in failing to keep a lookout for trains was the sole cause of his injuries.

The appellee had been in the employment of appellant as a section laborer for more than 20 years, and several years prior to the time of his injury he had been a section foreman in charge of the section of track on which his injury occurred. On the morning of the accident the section crew was engaged in lining the track at a point about three-quarters of a mile west from the town of Luzerne, Iowa. Before going to work that morning the appellee had called the train dispatcher for information concerning trains which would pass the point where the section crew was to work. He was informed that westbound freight train No. 253 would pass the scene of the work some time that morning, and that eastbound passenger train No. 2, a fast through train from the west coast would leave Boone, Iowa, a station on appellant's railway west of the accident, at 7:50 A. M. Appellee knew that ordinarily train No. 2 would reach the place where his crew was working at about 9 o'clock in the morning.

On the day of the accident the appellee and his section crew set off their motorcar near mile post 112, which was approximately 400 feet east of the beginning of a curve in appellant's tracks and more than 1000 feet west of another curve in the vicinity of Luzerne. Appellant operates double tracks on this part of its railway line. The section crew began work on the westbound track near mile post 112.

About 10 o'clock in the morning westbound freight train No. 253 passed the place where the work was being done. This train of approximately 100 cars was moving at a speed of 40 miles an hour. On its approach the section crew left their work on the westbound track, four of them taking their positions on the south side of the westbound track, and four, including the appellee, on the north side of the eastbound track.

At the point where the accident occurred appellant's tracks are laid upon an embankment which is from six to ten feet higher than the level of the adjacent ground. The rails and ties are laid upon ballast of crushed rock, raising the top of the rails about two feet above the level of the railway embankment proper. Appellee and the section hands who stood on the north side of the eastbound track while the freight train passed took their positions on the shoulder of the embankment proper, referred to in the evidence as the sub-shoulder. While the freight train was passing, appellee stood on this sub-shoulder four or five feet from the north rail of the eastbound track, and about two

feet below the level of the top of the rails of that track. The four men on the south side of the westbound track occupied like positions on the railway embankment.

The rules of the railway company required section laborers to stand in places of safety while a train passed and to inspect the cars in the train for hot boxes, dragging brake beams, swinging doors, flat wheels, and other defects visible to them as the train passed, and on discovery of any of these defects to signal the trainmen in charge of the train. It was the custom in the operation of appellant's railway for sectionmen to give the trainmen in charge of a passing train a wash-out signal on the discovery of any defects endangering the operation of the train and a highball signal in case no defects were discovered. The rules of the railway company also made the section foreman responsible for the safety of himself and of the men under him. By these rules the section foreman was advised that trains might be moving over the tracks at any time, and in double track territory on either track in either direction. He was required to maintain a lookout for all trains, and to give his men adequate warning of the approach of a train in time to enable them to leave their work and move from the tracks to places of safety. All the rules just mentioned were definite and certain, permitted no exceptions, and were fully understood by the appellee and the members of his crew.

While the freight train was passing, the four sectionmen on its south side and the appellee and three sectionmen on the north side looked carefully at each car as it passed in obedience to the rule requiring them to inspect passing trains. When the caboose or last car of the freight train passed, the appellee left his position on the subshoulder of the embankment, moved to a position very close to the north rail of the eastbound track, looked to see what signal the men on the south side of the train were giving to the trainmen, and turned to the west to repeat the signal. As he did so, he discovered eastbound train No. 2 within 50 feet of him, according to his estimate. He was then standing on the crushed rock ballast on which the east-bound track was laid. Attempting to move away from the track, his right foot slipped in this loose rock, he fell or was drawn toward the train, and was struck by some part of the engine. He was thrown to one side of the embankment and suffered a broken arm, broken or cracked ribs, abrasions on his face and body, and a severe wound in one shoulder. He did not know what part of the engine struck him, but it seems clear from the fact that he survived the force of the impact that the blow he received must have been a glancing one.

Appellee testified that while he stood in a position of safety on the sub-shoulder of the railway embankment observing the passage of the freight train and inspecting it for defects dangerous to its operation, he looked both to the east and west and neither saw nor heard an approaching train. He said that just at the time he left his position of safety he looked to the west and did not see or hear passenger train No. 2. At that time he was standing approximately 200 feet from the beginning of the curve to the west of him around which the passenger train was then approaching. He estimated that he had a clear view of the track to the west of from 400 to 450 feet. Seeing no train he moved about two and one-half feet from his position of safety, which brought him almost to the end of the cross ties on the eastbound track. He said that he remained in this position, which clearly was a position of danger from any train moving on that track, for a matter of seconds. During that time he never again looked toward the west nor listened for an approaching train. It is clear that if he had looked to the west he could have seen the train in time to have avoided his injury. His explanation of this conduct was that he was required in the discharge of his duties as foreman to see what signal the men on the south side of the train gave before giving his signal to the trainmen in charge of the freight train. His attention was directed to observing the action of the men on the south side of the track. He admitted that it was his duty to maintain the railway ballast and embankment in proper condition at the point of the

852

accident, and he stated that there was nothing wrong with either at the time the accident occurred.

As tending to show negligence of the enginemen on the passenger train, appellee relied in part on their alleged failure to comply with appellant's Rule 116. One section of this rule requires the enginemen on a train approaching an obscure curve to sound two long and two short blasts of the whistle. Another section requires that a succession of short blasts of the whistle shall be sounded when the enginemen discover persons on the track ahead of the train. Appellee testified that he heard the whistle of the freight train as it approached the curve east of the point where the accident occurred, and that the whistle was sounded when the train was at least 1000 feet east of the point of the accident. He said that if the passenger train had sounded the whistle as it approached the curve west of the point of the accident he woud have heard it. He did not say that at any time while he stood in a position of safety on the sub-shoulder of the railway embankment he listened for that particular whistle of the passenger train.

Five of the sectionmen were called as witnesses for appellee. None of them heard any whistle from the passenger train until the moment of impact or almost immediately before appellee was struck. None of them testified that he listened for the whistle of the passenger train as it approached the curve west of the point of the accident. All of them, as well as appellee, testified to the loud noise of the freight train as it passed, and all of them and appellee admitted that while the freight train was passing their attention was fixed upon the inspection which they were required to give it. Two of these witnesses said that the noise of the freight train would, in their opinion, have made it impossible for them to hear the whistle of the passenger train as it approached the curve. Two others admitted that the hearing of the whistle would have been difficult because of the noise of the passing train. One declined to express an opinion. The place where the whistle should have been sounded for the curve west of the point of the accident was approximately a quarter of a mile to the west of that point.

For the appellant the engineer and fireman on the passenger train testified that the whistle was sounded as the passenger train approached the curve as required by Rule 116. As the train came around the curve it was impossible for the engineer because of the curve to see the appellee and the men on the north side of the eastbound track, since the engineer was on the inside of the curve and the men on the north side of the eastbound track were on the outside of the curve. Neither the engineer nor the fireman could see the men on the south side of the westbound track because of the passing freight train. The fireman testified that, as the engine rounded the curve just west of the accident, he first saw the men on the north side of the eastbound track when the engine was approximately 400 feet from appellee. At that time, the fireman said, the appellee was standing five or six feet from the north rail of the eastbound track in a position in which he was in no danger from the train. For that reason, he did not immediately sound the whistle. But when the engine was approximately 150 or 200 feet away, the appellee, according to the fireman, suddenly moved toward the track, and the fireman immediately sounded the whistle.

The engineer and fireman estimated the speed of the train at 60 miles an hour as it came around the curve. Appellee estimated the speed at from 70 to 80 miles an hour, and claimed that he made that estimate while the train was traveling a distance of 50 feet. The fireman said that because of the slow order limiting the speed to 50 miles an hour before the train approached the curve west of the accident, as well as because of the grade in the railway track as it approached the curve, it was impossible for the train to have attained a speed greater than 60 miles an hour at the point of the accident. At 60 miles an hour the train was moving at a speed of 88 feet per second. At 70 miles or more an hour its speed would have been in excess of 100 feet per second. If

the testimony of the enginemen as to the speed of the train and the testimony of the fireman that appellee stepped into a position of peril when the engine of the passenger train was not more than 200 feet from him can be accepted, little more than two seconds elapsed between the discovery of appellee's peril and his injury. If appellee's estimate of the speed of the train is to be accepted, less than two seconds elapsed between the time the fireman said he discovered appellee's peril and the moment the engine reached him. In such a short interval there was nothing that the trainmen on No. 2 could do to avoid striking appellee except to warn him by sounding the whistle. Whether the sounding of the whistle at a distance of 150 to 200 feet from appellee would have prevented the accident entirely upon whether the appellee could have moved from his place of danger before the engine reached him.

The accident occurred in the morning of a clear day. The passenger train was about one hour late.

At the conclusion of all the evidence appellant moved for a directed verdict on the grounds that there was no substantial evidence of negligence on the part of the railway company contributing to the cause of appellee's injury, and that the evidence conclusively established that appellee was guilty of negligence which was the sole cause of the accident and his resulting injury. The motion was denied over appellant's objections. Within due time after the reception of the jury verdict appellant moved the court for an order setting aside the verdict and for judgment for appellant on the grounds advanced in its motion for a directed verdict. Appellant also moved for a new trial. Both motions were denied over appellant's objections.

On this appeal the appellant renews its contentions that appellee failed to prove by substantial evidence any negligence of appellant contributing to cause appellee's injury, and that appellee's negligence was the proximate cause of his injury. Other grounds urged for reversal are alleged errors in the court's charge to the jury, in its refusal to charge the jury as requested by appellant, and in its rulings on the admissibility of evidence.

We think the case was clearly one for the jury. On this question we must view the evidence and the inferences reasonably to be drawn therefrom in the light most favorable to appellee. Terminal R. Ass'n of St. Louis v. Schorb, 8 Cir., 151 F.2d 361, 365; Chicago & N. W. R. Co. v. Grauel, 8 Cir., 160 F.2d 820, 825, 826. On the evidence before it we think the jury might reasonably have found for either the appellee or the appellant. The choice of findings of fact was for the jury and not for the court. Ellis v. Union Pacific R. Co., 329 U.S. 649, 67 S.Ct. 598, 600.

The jury might have concluded from the testimony of the fireman on the passenger train that he saw appellee and the other sectionmen on the north side of the eastbound track as soon as he could have discovered their presence in the exercise of ordinary care; and that when he first saw them the appellee was standing five or six feet from the track on which the passenger train was approaching and in a position of safety, where he remained until the train was not more than 200 feet from him; and that when appellee stepped into a position of danger the fireman promptly sounded the whistle on the train. On such a finding the jury might reasonably have concluded that appellee was guilty of negligence in stepping in front of the train which he must have seen had he looked and must have heard if he listened, and that appellee's negligence was the sole cause of his injury. On the other hand, the jury might have found that the fireman on passenger train No. 2, in the exercise of reasonable care, should have discovered the peril of appellee when the engine of the passenger train was 400 feet or more from him, and that the fireman negligently failed to warn appellee of his danger by sounding the whistle until it was too late for the warning to enable the appellee to escape. On appellee's testimony it was for the jury to say whether the fireman saw the appellee in a position of danger in time to give him warning, and whether his failure immediately to sound

the whistle was negligence contributing to appellee's injury.

■ One further contention of appellant relative to its right to a directed verdict may be noted. The argument is that the evidence conclusively established that the appellee violated the rules of the railway company, promulgated for the safety of himself and his men, requiring appellee to keep a lookout for passing trains and to give his men warning of their approach and to see that he and his men left the track and remained in a position of safety while the train passed. Appellant relies on the case of Chicago, St. P., M. & O. R. Co. v. Arnold, 8 Cir., 160 F.2d 1002, as authority for the rule that an employee's negligent violation of a rule of the character under discussion must be held on the facts of this case to be the proximate cause of his injury. We think appellant is mistaken in its interpretation of the Arnold case. See Henwood, Trustee, v. Coburn, Adm., 8 Cir., 1948, 165 F.2d 418, for a correct statement of the limitations upon the rule announced in that case. To what was said in the Coburn case we may add that in the Arnold case there was testimony for the appellant that the injured employee's superior gave him a specific warning of the hazard with which he was confronted, amounting in effect to an express command to abandon the position which exposed him to the risk of injury. The employee denied that the warning was given, but admitted that, if it had been given in the manner and at the time shown by his employer's testimony, he could and would have easily avoided the danger to which the employer's negligence had exposed him. On these facts it was held that it was for the jury to say whether or not the warning was given, and that if the jury so found the appellee's failure to heed it was the proximate cause of his injury.

The facts in the present case are exactly the reverse of those in the Arnold case. Here the appellee's negligence, if established by the evidence, was in violation of a general rule applicable in all situations, and the violation occurred before and not after the alleged negligence of the appellant contributing to cause his injury. Whether on the evidence the appellee was guilty of contributory negligence in failing to comply with the rule is not material on the question of appellant's liability, since appellee's negligence, if any, although contributing to cause his injury, is, nevertheless, no defense to an action under the Federal Employers' Liability Act if the negligence of the employer also contributed in part to cause appellee's injury.

Since the case was for the jury, we turn to a consideration of the alleged errors in the court's charge. Appellant levels its attack against that part of the charge reading as follows:

"It was the duty of the defendant and its agents and employees on approaching the place where the plaintiff was standing to use ordinary care to keep a look-out ahead and to sound the whistle if and when they saw the plaintiff in a position of danger on or near the track, and if you find from the evidence in this case that the employees of the defendant in charge of the engine on the passenger train failed to perform that duty, they were negligent and if such negligence, in whole or in part, was the proximate cause of the accident and injuries to the plaintiff, then your verdict should be for the plaintiff.

"A rule of the defendant in force at the time of the accident provided that a train on approaching a curve should give two long and two short blasts of the whistle, and a succession of short blasts as an alarm for persons on the track. The employees in the service of the defendant learn to and do rely on compliance with these rules, and if you find under the evidence in this case that these rules are applicable in this case and that they were not observed by the employees of the defendant in charge of the locomotive on the passenger train and that such failure to observe said rules misled and deceived the plaintiff, you should take such facts into consideration in determining whether the defendant, its agents, and employees in charge of said train performed their duty at the time and place of the accident."

The criticism of the first paragraph is that it imposed upon the enginemen on appellant's passenger train the duty of keeping a lookout for sectionmen. Appellant relies upon Jacobson v. Chicago, M.,

St. P. & P. R. Co., 8 Cir., 66 F.2d 688, 691; Central Vermont Ry., Inc., v. Sullivan, 1 Cir., 86 F.2d 171; and Chesapeake & Ohio Ry. Co. v. Nixon, Administratrix, 271 U.S. 218, 46 S.Ct. 495, 70 L.Ed. 914, as establishing the rule in Federal courts that a railroad company is under no duty to keep a lookout for sectionmen. See also Chesapeake & Ohio Ry. Co. v. Mihas, 280 U.S. 102, 106, 50 S.Ct. 42, 74 L.Ed. 207; Thomson v. Downey, 7 Cir., 78 F. 2d 487; Trust Co. of Chicago v. Erie R. Co., 7 Cir., 165 F.2d 806.

In the Jacobson case, 8 Cir., 66 F.2d at page 691, it was held with respect to the right of a section laborer to recover for injuries sustained when overtaken by a train running on a track on which he was working that: "It is his duty to keep a lookout for such engines and trains, rather than the duty of those in charge of such engines and trains to keep a lookout for him, or give him any warning, unless, of course, he is seen in a position of danger." The language quoted is typical of expressions in the opinions in the cases cited, although in some of them the reason given for the rule is the assumption by the sectionmen of the risk of being struck and injured by passing trains. For example, Chesapeake & Ohio Ry. Co. v. Nixon, Administratrix, supra, 271 U.S. 218, at page 219, 46 S.Ct. 495, 70 L.Ed. 914.

Insofar as the cases relied upon by appellant for the rule contended for are based upon assumption of risk, it is clear that they can not survive Tiller v. Atlantic Coast Line R. Co. 318 U.S. 54, 63 S.Ct. 444, 87 L.Ed. 610, 143 A.L.R. 967. Fleming et al. v. Husted, 8 Cir., 1947, 164 F. 2d 65. Nor in view of the Tiller case may the cases under discussion be accepted as controlling today if interpreted to hold that in all situations and in all circumstances the operators of a railroad train or engine are relieved from the duty of exercising ordinary care to discover the presence of a sectionman in danger on the track ahead of the train, and are charged only with the duty of warning him if discovered.

The Tiller case involved the question of the liability of an interstate carrier for the death of an employee who, at the time of his injury, was inspecting the seals on cars in the yards of the carrier. The accident occurred at night in an unlighted yard. The employee was killed when struck by cars of the carrier being moved on the tracks in the yard where he was working. He was an employee of experience, familiar with the yard in which he was employed, the customary method of moving cars on the tracks in the yards, and aware of the risks to which he was exposed in the work. He was familiar with the rules of the railway company which required him to watch out for moving cars and trains. He knew that no employee kept a lookout for him, and that no lights were carried by night or by day on the head end of back-up movements.

On the trial in the district court the judge directed a verdict for the carrier on the ground that the evidence disclosed no negligence on its part. The circuit court of appeals affirmed. Tiller v. Atlantic Coast Line R. Co., 4 Cir., 128 F.2d 420, 422. The appellate court held, on the authority of Chesapeake & Ohio Ry. Co. v. Nixon, Administratrix, supra, and like cases decided before the 1939 amendment to the Federal Employers' Liability Act, that since the movement of the cars in the railroad yard was conducted in the ordinary and customary manner, the railway company was not liable for the death of the employee. The court was of the opinion that under the Act, as amended in 1939, employees of an interstate carrier assumed the risk of injury not caused by negligence of the carrier, and that the rule announced in numerous cases before the adoption of the 1939 amendment that a carrier "was under no duty or obligation to look out for the employees within the yard or warn them of the approach of cars" was as valid after the amendment as before.

In reversing the court of appeals the Supreme Court declared (318 U.S. at page 58, 63 S.Ct. at page 446) "that every vestige of the doctrine of the assumption of risk was obliterated from the law by the 1939 amendment, and that Congress, by abolishing the defense of assumption of risk in that statute, did not mean to leave open the identical defense for the master by changing its name to 'non-negligence' ";

856

and that the Act as amended (318 U.S. at page 67, 63 S.Ct. at page 451) left "for practical purposes only the question of whether the carrier was negligent and whether that negligence was the proximate cause of the injury." The court said that in cases under the Act the carrier's liability is to be determined on the general rule which defines negligence as the lack of due care under the circumstances, and that in any case the standard of care must be commensurate with the danger of the business. In a concurring opinion Mr. Justice Frankfurter expressed doubt as to the conclusion of the majority opinion concerning the assumption of risk under the 1939 amendment to the Act, but he approved the holding that the case was nevertheless for the jury. Later opinions of the Supreme Court have followed and emphasized the rule in the Tiller case. Bailey v. Central Vermont Ry., Inc., 319 U.S. 350, 63 S.Ct. 1062, 87 L.Ed. 1444 (The duty of the employer becomes more imperative as the risk increases.); Brady v. Southern Ry. Co., 320 U.S. 476, 64 S.Ct. 232, 88 L.Ed. 239; Tennant v. Peoria & P. U. Ry. Co., 321 U.S. 29, 64 S.Ct. 409, 88 L.Ed. 520; Blair v. Baltimore & O. R. Co., 323 U.S. 600, 65 S.Ct. 545, 547, 89 L.Ed. 490 ("The negligence of the employer may be determined by viewing its conduct as a whole."); Lavender v. Kurn, 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916; Jesionowski v. Boston & M. R. R., 329 U.S. 452, 67 S.Ct. 401, 169 A.L.R. 947; Ellis v. Union Pacific R. Co., supra; and see Chicago & N. W. R. Co. v. Grauel, supra; and Henwood Trustee, v. Coburn, Adm., supra.

We think rule to be drawn from the later decisions of the Supreme Court is that an interstate carrier has the duty of exercising ordinary care to avoid injury of employees on the tracks by the operation of its trains, and that in the present case it was for the jury to say whether in the circumstances revealed by the evidence the enginemen on the passenger train No. 2 were negligent in failing to use ordinary care to keep a lookout ahead of the train. The challenged instruction did not tell the jury that the enginemen on train No. 2 were bound to keep a lookout, but that they were required to use ordinary care in the situation revealed by the evidence to maintain a lookout ahead of the train.

We think it clear, however, that the court committed prejudicial error in the second paragraph of the quoted charge. The rule referred to in this paragraph is Rule 116. Neither party introduced the complete rule in evidence, the appellant contenting itself with introducing the sections of the rule which it considered applicable and the appellee relying on his own interpretation of the rule; but, as shown by the evidence of both parties, the rule provided that on approaching an obscure curve the enginemen should sound two long and two short blasts of the whistle. The purpose of this alarm is not definitely shown in the evidence, but the reasonable assumption is that the sounding of the whistle on approaching a curve was required as a warning for persons on the track at a point in the curve where the enginemen could not discover them and they might not discover the train in time to avoid injury. Another paragraph of the rule required enginemen, on discovery of persons on the track ahead of the train in a place of danger, whether in or near a curve or elsewhere, to sound a succession of short blasts of the whistle.

There is no evidence in the record to support the statement in the charge that employees of the appellant situated as they were in this case customarily relied, or in this case did rely, on the sounding of the alarm prescribed for trains approaching the curve west of them. But, if it could be said that the jury might have reached this conclusion as an inference reasonably drawn from all the evidence, the court could not. Nor does the evidence support the statement that the rule requiring the sounding of a whistle on approaching an obscure curve was promulgated for the protection of sectionmen who might be on the track beyond the curve where they could be discovered by the enginemen, and where in the exercise of ordinary care they could discover the approach of the train in time to avoid injury from it.

This part of the charge submitted to the jury the question of whether the enginemen on train No. 2 sounded the alarm described by the charge on approaching

the curve just west of the point where the section crew was working. There is no substantial evidence to support a finding that the required alarm was not sounded on train No. 2 as it approached the curve. The testimony of appellee and the section laborers that they did not hear the whistle as passenger train No. 2 approached the curve west of the point of the accident is not substantial evidence that the whistle was not sounded when required by the rule. Under Rule 116 the whistle for the curve should have sounded at least a quarter of a mile west of the point where the accident occurred. When train No. 2 approached this curve, freight train No. 253 was passing the point of the accident. Appellee and all of the section crew were at that time standing in the clear of approaching trains. No testimony is needed to establish the fact that the noise of the freight train which was passing as passenger train No. 2 approached the curve west of the place of the accident would have made the hearing of the whistle difficult to persons who were not listening for it, whose attention was closely directed to the passing freight train, who were under no duty at the moment when the whistle should have been sounded to listen for the whistle, and who in fact were not listening for it. In these circumstances negative testimony of the character under discussion can not be accepted as substantial evidence that the whistle for the curve was not sounded when the engineer and fireman said it was. Jacobson v. Chicago, M., St. P. & P. R. Co., supra, 8 Cir., 66 F.2d at page 691; Flagg v. Chicago Great Western Ry. Co., 8 Cir., 143 F.2d 90, 93; Elzig v. Gudwangen, 8 Cir., 91 F. 2d 434; Trust Co. of Chicago v. Erie Ry. Co., supra, 7 Cir., 165 F.2d at page 809; Compare Henwood, Trustee, v. Coburn, Adm., supra; Roth v. Swanson, 8 Cir., 145 F.2d 262.

█ Since it is impossible to say whether the jury in this case based its finding of negligence on the part of the railroad company on the failure of the enginemen to sound the whistle as the passenger train approached the curve west of the point of the accident, or upon the failure of these employees to exercise ordinary care to keep a lookout ahead of the train, or upon their failure to sound a succession of short blasts of the whistle when they discovered appellee on the track ahead of the train, the giving of the instruction under discussion was prejudicial error requiring a reversal of the case. Stokes v. United States, 8 Cir., 264 F. 18, 23; Roth v. Swanson, supra, 8 Cir., 145 F.2d at page 269.

█ The court refused to include in its charge the following instructions requested by the appellant:

"You are instructed that there is no evidence in this case which will warrant you in basing a verdict for the plaintiff on the claim that defendant operated its passenger train Number 2 at an excessive rate of speed."

"You are instructed that there is no evidence in this case which will warrant you in basing a verdict for the plaintiff on the claim that defendant failed to maintain its tracks and roadbed in a reasonably safe condition."

"You are instructed that there is no evidence in this case which will warrant you in basing a verdict for the plaintiff on the claim that defendant failed to provide and maintain for the plaintiff a reasonably safe place to work."

The complaint charged negligence of appellant in operating its passenger train No. 2 at an excessive rate of speed and also negligence in failing to provide and maintain for the appellee a reasonably safe place to work and in failing to maintain its tracks and roadbed in a reasonably safe condition. The charge of negligence in failing to furnish appellee a safe place to work was emphasized in counsel's statement of the case to the jury. The jury were told that as appellee tried to step out of the way of the passenger train the loose rock on which he was standing gave way and caused him to slip or fall toward the train. They were advised that it was appellee's contention that appellant failed to furnish appellee a safe place to work in that it failed to have "this roadbed in such condition where a man could safely stand while he was inspecting another train and be in a position of safety to get out of the way of any other train that failed to give

the warning signal." The appellee testified that he slipped in the loose rock on which the rails of the eastbound track were laid, and that the sub-shoulder on which he stood while inspecting the train was sloping and not level. Charging the jury generally on the Federal Employers' Liability Act the court said:

"This case is based on a statute of the United States generally known as the 'Federal Employers' Liability Act,' which provides that every common carrier by railroad while engaging in interstate commerce shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce resulting in whole or in part from the negligence of any of the officers, agents or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment." [1]

The court also advised the jury that there was a dispute as to the speed of the passenger train at the time of the accident. The speed of the train and the condition of the roadbed at the place of the accident were discussed by counsel in the closing argument to the jury.

It is true that the court did not submit to the jury the question of the negligence of appellant in failing to furnish appellee a safe place to work or in operating its train at an excessive rate of speed. There was no evidence offered to show negligence in either respect. The evidence, however, was such as to justify the belief on the part of the jury that, regardless of negligence of either appellant or appellee, the appellee might have escaped injury but for the speed of the train and but for the fact that in attempting to escape he slipped and fell because of the insecure footing upon which he was standing. And although these charges of negligence passed completely from the case when the evidence was concluded, we think the court

should have given the substance of the requested instructions in view of the attention the safety of appellee's place of work and the speed of the train received in the argument of counsel and in the evidence of appellee; and because of the reference to these questions in the court's charge.

█ Of appellant's objections to the court's rulings upon evidence, we think only one requires comment. When Doctor O'Donnell, a medical witness for appellee, was under direct examination, the following occurred:

"Q. And what medical history did he give you? I am not interested in the history about the happening of the accident, but just the medical history that he gave you.

"Mr. Rietz: I object to that your Honor, unless this man was treated by the doctor,—any history given by this man unless the doctor was going to treat him is immaterial.

"By Mr. Green:

"Q. Doctor, did you examine him for the purpose of treating him if you found there was any treatment you could give him? A. No,—I treated his arm in the office and I gave him some advice as to what I thought he should do, but I can't say that I examined him for the purpose of treating him.

"The Court: (To the witness) You may answer.

"By Mr. Green:

"Q. You may give the history. A. Well, he told me that he had an injury to his face and to his arm and to his back, to his right little finger, and his right arm, and that he had had a compound comminuted fracture—that is, a fracture of both bones of the left forearm, in which the bone protruded through the skin, making it a compound fracture, and that there had been drainage for some time from some sinuses, as we call them—that is, open draining holes from the fractured

1 Compare Terminal R. Ass'n of St. Louis v. Howell, 8 Cir., 1948, 165 F.2d 135; Terminal R. Ass'n of St. Louis v. Fitzjohn, 8 Cir., 1948, 165 F.2d 473. On the facts in these cases it was held that in an action under the Federal Employ-, ers' Liability Act charging the jury in the words of the Act or reading the Act to the jury was not subject to the objection that such a charge was too general and failed to limit the consideration of the jury to the facts in the case.

arm that had required dressing, and he had had the arm in plaster casts and had been treated by the doctors, who had had him under their care, and that he still was having the drainage from the arm at that time and that the bones had not united at the fractured area of the arm, and that there was still a small point of motion from the fractured bones which occurred and that the arm was deformed and shorter than the other arm. He stated he had pain over the left half of his chest, over the left lower ribs. He told me he had had some fractures of his ribs, and he also complained of pain over his lower back in the region we call the lumbosacral joint at the lower part of the back. He told me he had had headaches and that he was still having some headaches, and that he had an occasional dizzy spell, and that he had this deformity from a healed scar over the left side of his face; that he had been unable to do any work since he was hurt.

"Mr. Rietz: I ask to have the answer stricken out Your Honor, on the grounds that it is incompetent and hearsay."

The motion was denied.

Later the doctor testified that on his examination of appellee he found no objective symptoms showing that appellee suffered pain in the lower region of his back or that he suffered from headaches or dizzy spells. But he gave it as his opinion that if the appellee suffered pain in his back which he claimed to suffer and if he suffered from the headaches and dizzy spells, he had received an injury to his back and a severe concussion of the brain. Since it is clear that the doctor did not examine the appellee for the purpose of effecting a cure of his injury but only to qualify himself as a favorable witness, the doctor's testimony as to the history of the case given him by appellee was inadmissible because hearsay. United States v. Nickle, 8 Cir., 60 F.2d 372, 374; London Guarantee & Accident Co. v. Woelfle, 8 Cir., 83 F.2d 325, 335; Meaney v. United States, 2 Cir., 112 F.2d 538, 130 A.L.R. 973, and cases referred to in the Annotation on page 977; Strommen v. Prudential Insurance Co., 187 Minn. 381, 245 N.W. 632, 634; Bliss v. Swift & Co., 189 Minn. 210, 248 N.W. 754, 755. The fact that the doctor's testimony repeated symptoms referred to by the appellee or other witnesses does not necessarily cure the error. "Any one familiar with the trial of cases knows that the history of a patient, testified to by a physician, is frequently much more impressive than the same history given on the stand by the plaintiff himself." United States v. Nickle, 8 Cir., 60 F.2d at page 374. Whether in view of appellee's testimony concerning his subjective symptoms the reception of this evidence over appellant's objection, no other error appearing, would require reversal, we need not decide. The evidence was inadmissible, and in the event of a new trial the appellant is entitled to have it excluded.

Reversed and remanded with directions to grant a new trial.