**VOLASCO PRODUCTS COMPANY,**
Plaintiff-Appellee,

v.

**LLOYD A. FRY ROOFING COMPANY,**
Defendant-Appellant.

**VOLUNTEER ASPHALT COMPANY,**
Plaintiff-Appellant,

v.

**LLOYD A. FRY ROOFING COMPANY,**
Defendant-Appellee.

**VOLASCO PRODUCTS COMPANY,**
Plaintiff-Appellant,

v.

**LLOYD A. FRY ROOFING COMPANY,**
Defendant-Appellee.

**Nos. 14545–14547.**

United States Court of Appeals
Sixth Circuit.

Sept. 12, 1962.

William C. Wilson, Knoxville, Tenn. (W. L. Ambrose, Jr., Ambrose, Wilson & Saulpay, Knoxville, Tenn., on the brief), for Volasco Products Co. and Volunteer Asphalt Co.

Burton Y. Weitzenfeld and Samuel Weisbard, Chicago, Ill. (Kahn, Adsit & Arnstein, Chicago, Ill., on the brief), for Lloyd A. Fry Roofing Co.

Before CECIL and O'SULLIVAN, Circuit Judges, and BOYD, District Judge.

CECIL, Circuit Judge.

These appeals are from the United States District Court for the Eastern District of Tennessee, Northern Division. Volasco Products Company and Volunteer Asphalt Company, as plaintiffs, brought an action against Lloyd A. Fry Roofing Company, defendant, charging it with violation of the anti-trust laws, to their damage. The parties will be referred to as plaintiffs and defendant, as they were in the District Court, or as Volunteer, Volasco and Fry.

The action arises under the Sherman Act and the Clayton Act, Title 15 U.S.

C.A. §§ 1–27. The particular sections of the Sherman Act involved are sections 1 and 2 (Title 15, §§ 1 and 2) the pertinent parts of which are as follows: Sec. 1 "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." Sec. 2 "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, * * *."

Sections 2(a) and 2(b) of the Clayton Act, as amended by the Robinson-Patman Act (Sections 13(a) and 13(b), Title 15 U.S.C.A.) are invoked by plaintiffs and so far as pertinent read as follows: Sec. 2 (a) That "It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, * * * where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: Provided, That nothing herein contained shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered: * * * And provided further, That nothing herein contained shall prevent price changes from time to time * * * in response to changing conditions affecting the market for or the marketability of the goods concerned."

Sec. 2(b): "Upon proof being made, at any hearing on a complaint under this section, that there has been discrimination in price or services or facilities furnished, the burden of rebutting the prima-facie case thus made by showing justification shall be upon the person charged with a violation of this section, and unless justification shall be affirmatively shown, the Commission is authorized to issue an order terminating the discrimination: Provided, however, That nothing herein contained shall prevent a seller rebutting the prima-facie case thus made by showing that his lower price or the furnishing of services or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor, or the services or facilities furnished by a competitor."

Under section 4 of the Clayton Act (Section 15, Title 15 U.S.C.A.) any person who is injured in his business or property, by reason of anything forbidden in the above quoted anti-trust laws, may sue for damages in a District Court of the United States and recover threefold the damages sustained, together with costs and a reasonable attorney fee.

The plaintiffs are corporations organized and existing under the laws of the state of Tennessee and doing business in that state, with headquarters at Knoxville. Both corporations are owned by the same stockholders and have the same officers. Volunteer was organized in 1954 for the purpose of operating an asphalt refinery for both road and roofing asphalt. Volasco was organized in 1955 for the purpose of manufacturing asphalt roofing materials, including asphalt saturated felt, asphalt roll roofing, and asphalt shingles. Volunteer had been operating its refinery since 1954 and Volasco had been manufacturing and selling saturated felt, as well as some other asphalt roofing products since 1955. Volasco never got into production of roll roofing and asphalt shingles.

Fry is a corporation organized under the laws of Delaware, is doing business in Tennessee and is the largest manufacturer of asphalt roofing products in the United States. It owns and operates nineteen plants strategically located throughout the United States. Its clos-

est plants to Knoxville are at Memphis, Tennessee, and at Brookville, Indiana. The defendant, with seven other large companies, does approximately sixty-five percent of the business in the United States in asphalt roofing, siding, felts and shingles.

Briefly stated, the plaintiffs charged that the defendant cut prices in the Knoxville area, where the plaintiffs did business, below the plaintiffs' prices, while at the same time it maintained higher prices in territory outside of plaintiffs' limited field of operations. They also charged that the defendant combined and conspired with other large manufacturers of asphalt products to engage in an identical pricing program, for the purpose of creating a monopoly and destroying competition.

The issues as presented by the complaint are substantially and briefly, as follows: 1. Did the defendant Fry conspire with one or more other manufacturers of roofing products to fix prices in violation of the anti-trust laws within an approximately 200-mile radius of Knoxville, Tennessee? 2. Did the defendant alone or in combination with other roofing manufacturers, monopolize or attempt to monopolize the sale of asphalt roofing products in the above area by fixing prices of such products in the area lower than prices fixed in other non-competing areas, in violation of the anti-trust laws? 3. Did the defendant, during the relevant period, discriminate in prices between two or more purchasers of asphalt roofing products on a geographic basis by charging purchasers within the approximate 200-mile radius of Knoxville area a lesser price than purchasers outside that area, the effect of which discrimination may have been substantially to lessen competition, to create a monopoly or to injure, destroy or prevent competition, in violation of the anti-trust laws? And if the defendant did so discriminate in prices within the relevant area, did it do so in good faith to meet an equally low price of its competitors? 4. Did the plaintiffs suffer damages as a direct and proximate result of any of the alleged violations of the anti-trust laws by the defendant?

The case was tried to a jury and a verdict was returned in favor of the plaintiff Volasco Products Company in the sum of One Hundred Thousand Dollars ($100,000). The District Judge trebled this amount and gave judgment to the plaintiff Volasco Products Company for Three Hundred Thousand Dollars ($300,000), plus Sixty Thousand Dollars ($60,000) attorneys' fees. (Section 15, Title 15 U.S.C.A.) The District Judge also entered an order of injunction against the defendant enjoining it from further violation of the laws in respect to the matters charged in the complaint. The defendant appealed and this appeal is number 14545 on the docket of this Court. At the close of the plaintiffs' testimony, the trial judge directed a verdict in favor of the defendant and against the plaintiff Volunteer Asphalt Company. Volunteer appealed and its appeal is number 14546 in these appeals. Hereinafter the term "plaintiff" will be used in the singular to mean Volasco. The District Judge ruled against Volasco on certain items and claims of damages and it appealed, which appeal is number 14547 on the docket.

We will proceed first with the defendant's appeal. One of the first assignments of error for discussion relates to the first issue stated above and raises the question of whether there was sufficient evidence of conspiracy to submit that issue to the jury.

A review of the record discloses that there was substantial evidence bearing on this issue. When Volasco began manufacturing asphalt saturated felt, in October 1955, it set its price in line with that of the major roofing manufacturers, which was $2.44 per roll. At this time, Fry's price was $2.24. Effective November 1st of that year, Fry reduced its price in the Knoxville area to $1.84 per roll. Volasco then adjusted its price lower and sold at $2.12, $2.11, $2.00 and for one day at $1.84.

On February 19, 1956, Fry published a new price schedule with a new method

of marketing, involving an intricate system of zoning. On this schedule, the price at Knoxville was fixed at $2.16 per roll. All of the major roofing manufacturers, effective on February 19th or a day or two thereafter, abandoned their former pricing methods and adopted the Fry plan with its schedule of prices. They published price lists substantially identical with that of Fry, even down to an apparently erroneous zone classification of Blount County, subsequently changed by Fry. (Ex. 95, 96, 97.)

From February 19, 1956, until March 3, 1958, Fry published thirteen price schedules. With this last schedule it again changed its pricing system. It abandoned the county zone plan and established a uniform list price for its products for the whole of the United States east of the Rocky Mountains. Under this schedule the price in Tennessee was $1.62 per roll, and with a secret year-end rebate, it was $1.54. As of this date, no other manufacturer had sold asphalt saturated felt as low as $1.62 per roll in the Knoxville area. This schedule was also followed by the other companies, Mr. Fry, Jr., said, on cross-examination, that generally speaking the prices of all major companies had been the same since February 1956.

Beginning with February 4, 1957, there were eight price changes. In all of these, the Knoxville price was substantially lower than the Chicago price, and in all but one, it was lower than the Brookville price. The trend of these prices was downward.

Mr. Lloyd A. Fry, Sr., and his son, Lloyd A. Fry, Jr., were not members of the Asphalt Roofing Industry Bureau, but they attended some of their meetings socially. Mr. Fry, Jr., attended a meeting, at the Westchester Golf and Country Club, in Rye, New York, in October 1955. He attended another one at the Essex House, in New York City, in October 1956. Both Mr. Fry, senior and junior, attended a meeting of the Bureau at the Blackstone Hotel, in Chicago, in the spring of 1956. They did not attend business sessions, but most of the leaders in the industry were present, and the conversations ranged over various subjects, including some discussion of business and its competition.

On February 23, 1956, four days after the effective date of the February 19th new marketing plan, Mr. J. J. Musico, Manager of Fry's Brookville, Indiana, plant, said, in answering the complaint of a customer:

"I know by this time that you have the new merchandising plan which I understand the entire Industry has adopted and it is with my very honest opinion that this will clean up all this mess. * * *

* * * * * *

"* * * I am of the firm opinion that the Roofing Industry's House should be, and will be clean, for the first time. * * *" (Ex. 123.)

In a letter to another customer, on April 13, 1956, he wrote:

"You will note that Blount County is now Zone 2 which puts it in line and I am sure that you will find all other manufacturers quoting on this same basis." (Ex. 124.)

In another letter to a customer, on April 27, 1956, he wrote:

"I am well aware of the activities of these small Arkansas manufacturers and I assure you that we are watching them very closely. As usual, they are taking advantage temporarily, of an attempt to stabilize an industry which is long overdue for some stabilization from the view point of the wholesalers, dealers and roofers.

* * * * * *

"Nevertheless, I agree that they are a thorn in the side and in due time will be dealt with.

* * * * * *

"* * * At that time, if the menagerie is not changed there we will take corrective action." (Ex. 34.)

Some of the smaller roofing companies bore such names as Bear, Elk and Leop-

ard, and were collectively referred to by the industry as "menageries."

"The essential combination or conspiracy in violation of the Sherman Act may be found in a course of dealing or other circumstances as well as in an exchange of words." American Tobacco Co. v. United States, 328 U.S. 781, 809, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575. See also: United States v. Parke, Davis and Co., 362 U.S. 29, 44, 80 S.Ct. 503, 4 L.Ed.2d 505. Proof of parallel business behavior does not in itself constitute a Sherman Act offense. "The crucial question is whether respondents' conduct toward petitioner stemmed from independent decision or from an agreement, tacit or express. To be sure, business behavior is admissible circumstantial evidence from which the fact finder may infer agreement." Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., et al., 346 U.S. 537, 540, 74 S.Ct. 257, 259, 98 L.Ed. 273.

"It is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators. (Citations.) Acceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act." Interstate Circuit Inc. et al. v. United States, 306 U.S. 208, 227, 59 S.Ct. 467, 474, 83 L.Ed. 610; United States v. Masonite Corp., 316 U.S. 265, 275, 62 S.Ct. 1070, 86 L.Ed. 1461. See also: American Tobacco Co. v. United States, above cited, 328 U.S. at p. 810, 66 S.Ct. 1125; United States v. United States Gypsum Co., 333 U.S. 364, 394, 68 S.Ct. 525, 92 L.Ed. 746.

We conclude that the trial judge's instructions to the jury, on the law of conspiracy, were correct and that the evidence as herein reviewed was sufficient to take the case to the jury on that issue.

Other assignments of error which relate to the submission of issues to the jury are that the court erred in submitting to the jury the issues of monopolization and attempted monopolization.

Section 2 of the Sherman Act (Section 2, Title 15 U.S.C.A.) provides that it is a violation of the law for a *person* to monopolize or to attempt to monopolize, or for a *person* to combine or conspire with any other persons to monopolize any part of the trade or commerce among the several states.

■ The essentials of monopolization are, the power to raise or fix prices, to eliminate competition at will, or to unreasonably restrict competition, and the intent to exercise that power. United States v. E. I. duPont de Nemours & Co., 353 U.S. 586, 592, 77 S.Ct. 872, 1 L.Ed.2d 1057; United States v. E. I. duPont de Nemours & Co., 351 U.S. 377, 389, 76 S.Ct. 994, 100 L.Ed. 1264; American Tobacco Co. v. United States, 328 U.S. 781, 811, 66 S.Ct. 1125, 90 L.Ed. 1575; United States v. Griffith, 334 U.S. 100, 107, 68 S.Ct. 941, 92 L.Ed. 1236.

■ The evidence discloses that the defendant was the largest manufacturer of asphalt saturated felt in the United States. It was not the largest company manufacturing this product and in 1958 it was responsible for about twelve and one-half percent of the total sales of the industry in the United States. Some ten or eleven large companies were in the field and it was a highly competitive article. The relevant area in this case is described as the territory within two hundred miles of Knoxville. Most of the large companies, including the defendant, were selling in the relevant area during the years 1956, 1957 and 1958. The combined production of these large companies accounted for more than sixty-five percent of the gross sales of the industry in the United States, during the years herein involved.

There is no evidence of the percentage of the business which the defendant had in the relevant area. It seems unreasonable and impossible to assume that alone it could have monopolized the business in the Knoxville area with only a twelve and one-half percent of the total business of the country.

Under another claim in this case, it is charged that the defendant entered into a conspiracy with other large manufacturers to control prices in the relevant area, in order to exclude the competition of the small manufacturers of the product in question. We have held herein that there was sufficient evidence on that issue to submit to the jury. In the light of that evidence, we think the plaintiffs failed to make a prima facie case that the defendant alone had the power to monopolize the industry on asphalt saturated felt. Even if it could be construed that there is evidence that the defendant alone monopolized, or tended to monopolize the industry, there is no adequate instruction to the jury on the subject.

■ Counsel for the defendant specifically objected to the instructions to the jury for the reason that the trial judge did not separate monopolization and attempted monopolization, individually, from that alleged to have resulted from conspiracy.

Had the trial judge, in his instructions to the jury on monopoly, limited his charge to that part of the statute pertaining to a combination or conspiracy to monopolize, the issue could have been properly submitted to the jury. In defining the second issue, he said: "Did the defendant, *alone* or in combination with other roofing manufacturers. * * *" (Emphasis added.) Again, in defining monopoly he said: "Any individual or corporation *alone* may offend against the provisions of Section 2 of the Sherman Act by monopolizing or attempting to monopolize interstate trade or commerce." (Emphasis added.) In summing up in his charge on monopoly, he defines conspiracy without relating it to the issue of monopoly.

The judgment of the District Court must be reversed for the reasons, that there is no evidence of monopoly in the relevant area by the defendant, individually, and for the failure of the trial judge to adequately instruct the jury on the issue involved.

■ The plaintiff Volasco claims that the "two issue" rule is applicable in Tennessee and that, if other issues were properly submitted to the jury, there can be no reversal because of an error in the submission of one issue. The plaintiff cites two cases from the Sixth Circuit, in support of this theory. Louisville & Nashville Railroad Company v. Rochelle, 252 F.2d 730, C.A.6, and Atlantic Coastline Railroad Company v. Smith, 264 F.2d 428, C.A.6. These cases are both diversity cases tried in Tennessee where the two-issue rule prevails (Tennessee Central Ry. Co. v. Umenstetter, 155 Tenn. 235, 291 S.W. 452) and under Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, the District Court must follow the substantive law of the state. Tennessee and Ohio are the only states in the Sixth Circuit to follow this rule. This case is tried under federal law where the "two issue" rule is not applicable. Wilmington Star Mining Co. v. Fulton, 205 U.S. 60, 78, 79, 27 S.Ct. 412, 51 L.Ed. 708; Baltimore and O. R. Co. v. Reeves, 10 F.2d 329, 330, C.A.6; Chicago and N. W. Ry. Co. v. Garwood, 167 F.2d 848, 857, C.A.8; Roth v. Swanson, 145 F.2d 262, 269, C.A.8; Atlantic Coast Line R. Co. v. Tiller, 142 F.2d 718, C.A.4.

■ Another assignment of error involves an essential and important issue— proof of the proper measure of damages. The Court allowed evidence of damages for loss of profits on asphalt saturated felt, mopping asphalt and coatings. The complaint was filed by the plaintiffs April 17, 1958. The Court took that date as the cut-off date for damages and allowed no proof of damages subsequent to that time. Volasco began its operations in October 1955. The crucial years for which Volasco claims damages are the years ending April 17, 1957 and 1958.

The plaintiff offered evidence to establish that had it not been for the alleged illegal competition of the defendant, it would have manufactured and sold 115,000 rolls of asphalt saturated felt in 1957 and 195,000 rolls in 1958. To arrive at these potentials, George C. Krug, president of Volasco, assumed that mopping asphalt and felt moved in a certain relationship to each other. On this basis he worked out a formula as follows: For the year ending April 30, 1956, Volasco sold 21,287 drums of asphalt. During the next year, it sold 52,598 drums. This was an increase of 247 percent the second year over the first. For the first full year of felt sales, ending April 30, 1957, Volasco sold 78,914 rolls of felt. On the theory that there would be a corresponding increase in felt the second year over the first, as there was between the first and second years in mopping asphalt, Mr. Krug took 247 percent of the felt sales for the year 1957 and arrived at a figure of 194,917 rolls as the potential for the year ending in April 1958.

Mr. Krug then drew a graph (Ex. 197) with the number of rolls indicated vertically along the left side of the graph and the time running horizontally along the bottom. September 1955 was represented as the zero point, at the lower lefthand side of the chart. A straight line was then drawn diagonally to the upper righthand corner representing 195,000 rolls in April 1958. This diagonal line crossed the date line of April 1957, at 120,000 rolls. Mr. Krug reduced this figure by 5,000 rolls and took 115,000 as the number of potential rolls for the first full year of manufacture. Thus we have the potential for the second year calculated on the basis of the actual number of rolls for the first year. Then the potential for the first year is determined from the potential of the second year.

This we think is a fallacious method of calculation for the reason that there is no evidence to support the claim that there is a general overall pattern that mopping asphalt and felt move in any particular relation to each other. There is no complaint that the alleged illegal competitive prices involved mopping asphalt. Mr. Krug testified that mopping asphalt fell off with sales of felt but he made no explanation of this. Maybe sales of that product were not pushed. We do know that the salesman was taken off the road when the competition on felt became oppressive. Furthermore, it is not reasonable that business will increase in the proportion indicated on the graph. The trial judge ruled out evidence that would have carried this business progression on in a continued straight diagonal line, through 1960 and 1961. This has no bearing on the case, except to point up the fallacy of the claim.

As we have previously said, felt was a highly competitive article. Assuming legitimate competition of the ten or eleven large companies in the field, each of which was entitled, in good faith, to meet competition, the plaintiff could not have expected to dominate his chosen area, to the extent of increasing sales 247 percent a year.

In order to double-check his projection, for the first year of felt sales, Mr. Krug referred to his customer accounts and worked out another formula. He took the first year of Volasco's operation, ending in September 1956, and found that at the end of that year the company had 141 customer accounts and sold them 57,941 rolls of felt. Starting with no accounts at the beginning of the year, the average number for the year was 70. This would be equivalent to 822 rolls per account. For the year April 1956 to April 1957, the company started the year with 98 accounts and ended it with 183. This was an average of 140 accounts for the year. On the basis of 822 rolls per account, the projection for the year was 115,491 rolls.

If the company maintained its 98 accounts and received 85 new ones during the year—what did it sell to those accounts? Did it sell mopping asphalt and coatings only? Or did it sell felt? If they sold some felt to these customers, how were they affected by the alleged illegal competition? Did these custom-

ers buy some felt and then refuse to buy more because of the lower prices of the alleged conspiracy? There is no evidence to show why these customers did not buy their alleged quota of 822 rolls. If they bought mopping asphalt and coatings only, then the claim that asphalt and felt move in a fixed relation to each other fails. Actual sales of asphalt increased to 59,430 drums in 1958, an increase of about thirteen percent over 1957. During the same period, felt decreased from 78,914 rolls in 1957 to 61,271 rolls in 1958. In the two succeeding years, as shown by exhibit 163, sales of asphalt increased to 72,856 and 79,915 drums, respectively. During these same years, felt sales decreased to 50,326 and 37,729 rolls, respectively. While the court did not allow the plaintiff to prove damages for the years 1959 and 1960, the evidence does refute Mr. Krug's claim that when felt sales fall off the sale of asphalt also diminished.

Mr. Sam C. Bye, an accountant, of Cleveland, Ohio, testified with reference to a market study he claimed he made of the area of Fry's Morehead City, North Carolina, plant, and the area of the plaintiff's plant at Knoxville. He testified that these areas were similar in respect to size, population, and commercial and residential buildings, etc. He further testified that the Fry plant shipped 275,000 rolls of felt in 1957 and 341,000 rolls in 1958. From this he deduced that Volasco would have a potential of 300,000 rolls per year. He then testified "that with an aggressive sales organization and a determination on the part of management to give their customers in the sales area a good service and fast service, I think that it would be entirely reasonable to assume that they could have reached the 195,000 rolls by the end of April 1958." How he arrived at this figure is unexplained. He applied no mathematical formula. It appears to be a figure arbitrarily taken out of thin air. It happens to be the same figure that Mr. Krug had on his graph (Ex. 197) arrived at, as heretofore explained, by an equally unsound method of calculation.

The witness was asked if he had an opinion as to whether the sales activity and the other matters about which he testified were such that Volasco could have reached 195,000 rolls in 1958. When an objection was made to the question, the court asked him if there was any way that he could answer the question from an accounting standpoint. He said that he could do it statistically and then used the same formula that Mr. Krug had used to arrive at 195,000 rolls for 1958. This figure is wholly unrelated to the arbitrary one arrived at by the comparison method as above explained.

Mr. Bye conditioned his estimate on an aggressive sales organization and good service etc., without knowing anything about Volasco's sales organization or its ability to give the kind of service he had in mind. One cannot say Morehead City shipped over 300,000 rolls in a year, therefore, Volasco in another area, even though essentially similar, could ship a similar number of rolls. A number of factors, unknown here, would be involved. We think this comparison was wholly irrelevant to the question of damages in the case at bar and that the trial judge was in error in admitting it into evidence.

We recognize that the plaintiff is not required to prove its damages with absolute mathematical accuracy and that the plaintiff is not to be denied damages simply because they cannot be computed with exactness. However, the evidence must furnish some approximation of the actual damages so that they may be determined with reasonable certainty. We believe that here the plaintiff, in an effort to be specific, has indulged in theories that result in proof that is speculative, remote and uncertain. Bigelow v. R. K. O. Radio Pictures, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652; Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544; Eastman Kodak Co. v. Southern

Photo Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684.

■ We think the plaintiff was not entitled to recover for loss of sales on mopping asphalt and coatings. The prices of these products were not involved in the alleged price manipulations which affected felt sales. The evidence does not support Mr. Krug's statement that sales of those products decreased proportionately with the sales of felt.

■ Another item of damage allowed by the court was the loss of value to the business. The defendant claims that this was a duplication of damages. In calculating these damages, the plaintiff shows by exhibit 194 that the actual investment in its property, as of April 18, 1958, was $188,741.13 and that its liquidating value, on the theory that it could not be operated as a felt manufacturing plant, was $148,840.00, a loss of $39,-901.13. The plaintiff did not liquidate its business and when it received a verdict for lost profits and an injunction to prevent further illegal pricing, it was made whole and suffered no loss to its investment in its property. In Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544, the plaintiff was forced out of business. Both elements of damages were allowed in Atlas Building Products Co. v. Diamond Block and Gravel Co., 10 Cir., 269 F.2d 950, 958, cert. denied, 363 U.S. 843, 80 S.Ct. 1608, 4 L.Ed.2d 1727, but there is no indication that they overlapped, as they do here.

The defendant challenges the competency of the testimony of Krug and Bye, with respect to the cost of defendant's production of felt. The purpose of this testimony was competent as bearing on the intention and good faith of the defendant. On the whole, we think the method of calculation was proper. There may have been some assumptions of facts not based on documentary or other evidence in the record. However, the trial judge can watch this and correct it, if necessary, in a retrial. It is interesting to note that the accountant's estimate of the defendant's costs is from $1.88 to $1.98 per roll, as compared with the plaintiff's costs of $1.71 in 1957 and $1.67 in 1958. (Exs. 195, 196.)

We are of the opinion that the objection of the defendant to Mr. Krug's testimony, at the close of the defendant's case, was proper and should have been sustained. This was not rebuttal testimony and while it may not have been prejudicial it should be corrected on a retrial of the case.

Other errors have been assigned by defendant. Wherein such matters relate to discretionary rulings of the District Judge we find no abuse of discretion. Other matters relating to the conduct of the trial and the admission or rejection of evidence may not arise upon a new trial and we find it unnecessary to now consider them.

For the reasons herein stated, the judgment is reversed and the case remanded to the District Court for a new trial consistent with this opinion.

■ In case No. 14546, the plaintiff, Volunteer Asphalt Company, appeals from the judgment of the District Court in directing a verdict in favor of the defendant at the close of the plaintiff's testimony.

George C. Krug and his brother, J. A. Krug, early in July decided to go into the asphalt roofing business. Subsequently they determined to handle road asphalt also. At first they operated as a partnership, under the name of Tennessee Associates. In July 1954, they incorporated Volunteer Asphalt Company, for the purpose of conducting the business through a corporation. It was the original intention to carry on the roofing and road asphalt operation through this corporation.

In May of 1955, for financial reasons not pertinent to the issue here, they incorporated Volasco Products Company. The stock of both corporations was entirely owned by the two partners. Volasco became the manufacturer of the roofing products and Volunteer a supplier

of raw materials for Volasco's manufacture.

The basis of Volunteer's claim for damages is that defendant's illegal actions reduced Volasco's sales of saturated felt, roof coatings and mopping asphalt, and that therefore the volume of raw material required from Volunteer was reduced and it in turn lost its profit on this material.

The trial judge dismissed Volunteer's complaint for the reason that it was a supplier and not directly injured by the alleged misconduct of the defendant.

This plaintiff claims that there are two theories, either of which will support its right to recover damages from the defendant. The first theory is that George and J. A. Krug owned all of the stock of both corporations and that, therefore, they were operating a unified business.

This flies in the face of all theories of corporate law. Corporations are separate entities, having various privileges, immunities and responsibilities, including the rights to sue and be sued. Individuals who desire to do business through a corporation gain some advantages and probably sacrifice others. The Krugs, for reasons sufficient to them, decided to operate through two corporations and they must now abide by the consequences. "They placed only one of the two corporations in direct competition with defendant. And their choice limits their potential recovery," as was well said in Snow Crest Beverages, Inc. v. Recipe Foods, Inc., 147 F.Supp. 907, D.C.Mass.

Their theory of a unified business is fallacious for the reason that if it were one business, there would be but one cause of action and one recovery. Of course, the claim for damages may have been larger, but the Krugs chose the field of activity for each corporation. It became corporate business not Krug's business. There are times when the law will look through corporate structure for the real party in interest, but Chicago, Milwaukee and St. Paul Railway Co. v. Minneapolis Civic and Commerce Association, 247 U.S. 490, 38 S.Ct. 553, 62 L.Ed. 1229, and California Zinc Co. v. United States, 72 F.Supp. 591, 109 Ct. Cl. 440, as cited and quoted from by the plaintiff, are not applicable here.

The other theory is that because of Volunteer's connection with Volasco, as a supplier of all asphalt used by Volasco, it was directly injured by the defendant's violations of the anti-trust laws.

Counsel for plaintiff cite two cases, neither of which is in point. In Karseal Corporation v. Richfield Oil Corporation, 221 F.2d 358, C.A.9, the plaintiff was the manufacturer of a finished product, an automobile polish. The defendant made contracts with its filling stations whereby it would not permit them to use its gasoline, if they sold automobile polish other than the one sponsored by defendant. Volunteer supplies raw material and does not manufacture the finished product which is the subject of this action.

Congress Building Corporation v. Loew's, Incorporated, 246 F.2d 587, C.A. 7, presents a wholly different state of facts. In this case the plaintiff, owner of a theatre, sued its lessee and certain motion picture distributors for a conspiracy in violation of the anti-trust laws. The plaintiff's rent was based on a percentage of the gross receipts. The claim of the plaintiff was that the conspiracy caused a decrease in the gross receipts and, as a result, plaintiff's rent was reduced. The lessee was one of the co-conspirators. The court held that there was an injury and that the alleged acts of the defendants were clearly the direct and proximate cause of the injury.

Counsel for plaintiff quote from the opinion in this case. "Not only is this 'limitation' (that is that a supplier is not directly injured) without support in the language of Section 4 but it appears to have been implicitly rejected by the Supreme Court." In support of this statement, the court cites Radovich v. National Football League, 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456, and Bigelow

v. R. K. O. Radio Pictures, Inc., 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652.

We do not find that these cases either reject or accept this limitation. It was not in issue in either case. Radovich was a football player and he brought an action against the National Football League for violation of the anti-trust laws. He was the person directly injured by the alleged illegal conduct. The Court said Congress had allowed for private enforcement of the anti-trust laws by an *aggrieved* party and that the laws protected the *victims* of the forbidden practices, as well as the public. Indirect and remote parties cannot be read into the word "victims."

In the Bigelow case, the plaintiffs were the owners and operators of a theatre and were the ones directly injured by the alleged anti-trust law violations of the defendant. In this case, the issue involved the proof of damages. The proof of plaintiffs' damages could not be calculated with certainty. The court said: "The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." (327 U.S. p. 265, 66 S.Ct. p. 580.) This involved the damages of the plaintiffs who were directly injured and cannot be extended to mean indirect or remote parties such as suppliers.

It is well established in the law that a supplier is too remote and too far removed from the direct injury to recover damages resulting from violation of the anti-trust laws directed against the supplier's customer. Martens v. Barrett, 245 F.2d 844, C.A.5; Melrose Realty Co., Inc. v. Loew's, Inc., 234 F.2d 518, C.A.3, cert. denied, 352 U.S. 890, 77 S. Ct. 128, 1 L.Ed.2d 85, rehearing denied 355 U.S. 900, 78 S.Ct. 259, 2 L.Ed.2d 198; Productive Inventions v. Trico Products Corp., 224 F.2d 678, C.A.2, cert. denied, 350 U.S. 936, 76 S.Ct. 301, 100 L.Ed. 818; Conference of Studio Unions v. Loew's, Inc., 193 F.2d 51, C.A. 9, cert. denied, 342 U.S. 919, 72 S.Ct. 367, 96 L.Ed. 687; Harrison v. Para-

mount Pictures, 115 F.Supp. 312, 316, D.C.E.D.Pa., affirmed 211 F.2d 405, C.A. 3, cert. denied, 348 U.S. 828, 75 S.Ct. 45, 99 L.Ed. 653; Snow Crest Beverages v. Recipe Foods, cited above.

The judgment of the District Court, in dismissing Volunteer's action against the defendant, is affirmed.

In case No. 14547, the plaintiff Volasco Products Company appeals from adverse rulings of the trial judge on the admission of evidence with reference to its claims on items of damages.

This is a conditional appeal to be considered by the Court only in the event a reversal is ordered in case numbered 14545.

The plaintiff claimed damages on asphalt shingles and roll roofing, on the theory that it was prevented from entering into the manufacture of those items by reason of the conduct of the defendant in violating the anti-trust laws.

Mr. George C. Krug testified that when he and his brother went into the asphalt business, it was their intention to also manufacture roll roofing and asphalt shingles. At the time the complaint was filed, the machinery for making these products had not been purchased. Mr. Krug claimed that the plaintiff had the plant capacity and the capital necessary to purchase and install the machinery required to equip the plant for the production of roll roofing and asphalt shingles. The cost would have been approximately $60,000.

The trial judge rejected the claim for damages on these items for the reason that the proof showed that the plaintiff never had the capacity to produce them, in that it had not installed the plant facilities required for their manufacture.

We think the trial judge was correct in his ruling. There was only a stated intention to enter into this additional production with no overt act performed in connection therewith and no expenditure of money to provide the required facilities. Preparedness and capacity to engage in a business mean more than an

intention so to do and an ability to buy the necessary facilities. Stearns v. Tinker and Rasor, 252 F.2d 589, 606, C.A.9; Triangle Conduit and Cable Co., Inc. v. National Electric Products Corporation, 152 F.2d 398, C.A.3; American Banana Co. v. United Fruit Co., 166 F. 261, C.A. 2, affirmed, 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826; Cf. Pennsylvania Sugar Refining Co. v. American Sugar Refining Co., 166 F. 254, C.A.2.

The plaintiff objected to the measure of damages the trial judge allowed in proving loss to the business. In appeal numbered 14545, we disallowed the item of loss to business, on the ground that it was a duplication of damages. It is not necessary to discuss the question further here.

 The plaintiff had a theory of damages which it called its "mature year concept." By this theory, it sought to prove damages subsequent to the date of filing suit, the cut-off date for damages, as adopted by the trial judge. It was claimed by the plaintiff that it would have a progressive growth for about five years and then level off. At the end of this period it would have its mature growth. The theory of the plaintiff is that it was deprived of two years of this maturity by the alleged illegal acts of the defendant. This was tied up with a fifty-year lease on certain river-front property, which the plaintiff claimed would be the life of the business. Therefore, these mature years were forever lost.

The trial judge excluded evidence offered in support of this theory as being too speculative and remote. We agree. It is equally speculative as the proof which we reject in case No. 14545.

 The plaintiff claims the right to recover damages that accrued subsequent to the date of filing suit. Counsel for the defendant claim that the court allowed evidence on this element of damages and quotes instructions of the judge to the jury, during the progress of the trial, to that effect. As we read his final instructions to the jury, it appears that he allowed no damages after the filing date of the complaint.

The rule is that the plaintiff should be entitled to recover damages that accrue after the filing date, provided they are proximately caused by the wrongful and illegal acts committed by the defendant before the complaint was filed. Lawlor v. Loewe, 235 U.S. 522, 536, 35 S.Ct. 170, 59 L.Ed. 341; Flintkote Co. v. Lysfjord, 246 F.2d 368, 394, C.A.9, cert. denied, 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed. 2d 46; Connecticut Importing Co. v. Frankfort Distilleries, 101 F.2d 79, 81, C.A.2. Such damages must be proved with reasonable certainty and must not be speculative or remote. Bigelow v. R. K. O. Radio Pictures, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652; Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544; Eastman Kodak Co. v. Southern Photo Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684.

The judgment of the District Court is affirmed in this appeal, except as to the rule above stated for the allowance of damages accruing after the date the action was begun.