P. D. HAYS and Ruth Hays, his wife, d/b/a Hays Fireworks Co., Appellees,

v.

UNITED FIREWORKS MFG. CO., Clipper Pyrotechnic Corporation, Zebra Distributing Company, W. Patrick Moriarty, Jack Martin and Elizabeth Moriarty, Appellants.

No. 22690.

United States Court of Appeals Ninth Circuit.

Dec. 9, 1969.

Noble K. Gregory, San Francisco, Cal. (argued), Pillsbury, Madison & Sutro, San Francisco, Cal., Dore, Dubuar & Cummins, Paul C. Gibbs, Seattle, Wash., for appellants.

Charles Lonergan, Seattle, Wash. (argued), of Corbett, Siderius & Lonergan, Seattle, Wash., for appellees.

Before HAMLEY, BROWNING and ELY, Circuit Judges.

HAMLEY, Circuit Judge:

This is a civil antitrust action for treble damages involving the fireworks business in the State of Washington. The plaintiffs are P. D. Hays and Ruth Hays, his wife. They own and operate Hays Fireworks Company, a sole proprietorship engaged in the wholesale and retail fireworks business in Olympia, Thurston County, Washington.

The defendants are three other fireworks companies and three individuals: United Fireworks Mfg. Co. (United), an Ohio corporation engaged in the manufacture of fireworks; Clipper Pyrotechnic Corporation (Clipper), a California corporation engaged in the wholesale fireworks business in California;[1] Zebra Distributing Company (Zebra), a Washington corporation engaged in the wholesale fireworks business in Washington; Jack Martin; W. Patrick Mo-

---

1. Clipper also operates under the trade names Red Devil and Red Devil Fireworks Company. The name Black Pan-ther is owned by Sierra Pyrotechnic Corporation, a subsidiary of Clipper.

riarty and his mother, Elizabeth Moriarty.[2]

In their complaint, filed March 25, 1965, plaintiffs invoked sections 1 and 2 of the Sherman Act, 26 Stat. 209, as amended, 15 U.S.C. §§ 1, 2 and section 3 of the Clayton Act, 38 Stat. 731, 15 U.S.C. § 14. As stated in their "Contentions for Pretrial Order," plaintiffs charged that defendants participated in an unlawful combination and conspiracy to control the number of available licenses authorizing the sale of fireworks in the relevant market, prevented customers from dealing with plaintiffs or other competitors, otherwise limited the number of independent operators, deprived independent operators of their source of supply, controlled the retail price of fireworks, and discriminated in prices charged.

Plaintiffs contended that defendants used various means to accomplish these objectives, including: (1) pooling of their purchasing power, credit, and assets; (2) imposing upon their customers the requirement that they purchase all their fireworks from defendants as a condition to obtaining any fireworks from defendants; (3) exerting economic pressure upon fireworks manufacturing companies to have them abstain from selling products to plaintiffs; (4) selling their products to each other at substantially lower prices and under more favorable terms than to independent operators; (5) selling substantially identical products at lower prices in areas where defendants experienced competition than in other areas in the state; (6) securing adherence to retail price schedules through advertising and otherwise; (7) obtaining agreements from their purchasers not to compete with United and Clipper in the manufacture of fireworks; and (8) suggesting local implementing ordinances or resolutions which limited the number of licenses to be issued, gave priority to previous license holders, and contained stringent terms of insurance protection.

According to plaintiffs, the result of defendants' activities was to restrain and destroy plaintiffs' business, monopolize the fireworks industry, limit the flow of interstate commerce, and establish noncompetitive price levels.[3] In their complaint, as thereafter supplemented, plaintiffs sought damages in the sum of $433,000 to be trebled. However, in an amended statement of contentions filed on October 23, 1967, plaintiffs claimed single damages in the amount of $53,820.

Defendants interposed various defenses. A jury trial resulted in a verdict against defendants for single damages in the sum of $14,500. The trial court trebled this to $43,500 and added attorneys' fees in the sum of $20,000. Judgment was entered for plaintiffs in the sum of $63,500, and defendants appealed.

Prior to January 1, 1962, the manufacture, importation and sale of fireworks within the State of Washington was governed by Chap. 174, Laws of 1951, amended by Chap. 34, Laws of 1953, and the ordinances and resolutions of municipal corporations within the state. Under the state law as it then existed, all types of fireworks could be sold if permitted by local communities. Most

2. Martin worked for Zebra in Tacoma, Washington until 1959, when he left to work for United in Dayton, Ohio. He is the vice president, operating manager, and a director of United. He also owns stock in Zebra and Clipper. Moriarty owns thirty percent of the stock of Zebra and the same percentage of the stock of Clipper. He also owns forty-eight percent of the stock of United. He was a director of Zebra from 1959 to 1963, and president of that company from 1952 to 1963. He has been president of United since 1962, and president and a director of Clipper since 1959. Mrs. Moriarty is president of Zebra and has thirty percent stock interests in that company and in Clipper.

Additional defendants were named in the complaint but we are not concerned with them on this appeal.

3. In a supplemental complaint filed March 25, 1967, plaintiffs alleged a continuation to that date of the activities of the defendants described in the complaint.

communities, however, banned the sale of fireworks.

In 1951, such a ban became effective in all of Pierce County, Washington, where W. Patrick Moriarty and Elizabeth Moriarty had been conducting a partnership business in the sale of fireworks.[4] The Moriartys were therefore forced to discontinue their Pierce County business. They continued to operate, however, in other parts of the State of Washington and, later, in other parts of the country.

In 1961, the legislature of the State of Washington passed Chap. 228, Laws of 1961, a comprehensive act, effective January 1, 1962, referred to as the State Fireworks Law, now codified as RCW Chap. 70.77. This act prohibits the manufacture, import, export, possession or sale of any fireworks at wholesale or retail for any use without first obtaining a license from the State Fire Marshal. Pursuant to the provisions of RCW 70.77.315, any person may make application to the State Fire Marshal for a license to import and sell at wholesale or retail "safe and sane" fireworks within the State of Washington. "Safe and sane" fireworks are defined in RCW 70.-77.135 as all fireworks with a pyrotechnic content of less than 100 grams, with only end fuses, and that are not designated by the State Fire Marshal as dangerous.

In order to sell either at wholesale or at retail "safe and sane" fireworks within a particular county, city or town within the state, it is also necessary under the State Fireworks Law to obtain a permit from the appropriate local unit of government. Some of the local ordinances provide for an unlimited number of retail "safe and sane" fireworks permits, while others limit the number corresponding to the population.

When new markets were opened for "safe and sane" fireworks in Washington in 1962, the Moriartys increased their operations in that state through de-

fendant Zebra. From then on, according to plaintiffs, defendants engaged in the activities complained of, as summarized above.

■ On this appeal defendants first argue that the trial court erroneously permitted the jury to determine that certain efforts to influence public officials to obtain favorable fireworks legislation were illegal under the antitrust laws, and erroneously held that damages could be awarded for injuries resulting solely from such activities. As a legal basis for this argument, defendants rely upon the established rule that no violation of the antitrust laws can be predicated upon mere attempts to influence the passage or enforcement of laws. See United Mine Workers of America v. Pennington, 381 U.S. 657, 669–672, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 135, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961).

Defendants' efforts to influence public officials were apparently of two kinds. Defendants made a direct effort to obtain passage of local ordinances to their liking by appearing at community meetings, by contacting fraternal and other organizations which might sell fireworks at retail as a fund-raising activity, and by advertising. They also made an indirect effort in this direction by including, in some of Zebra's contracts with its dealers, a provision obligating the dealer to "(p)rovide assistance to insure passage of local legislation."

Defendants did not object to the introduction of these dealer contracts as exhibits, presumably because the contracts contained other recitals which were relevant and material. However, when counsel for plaintiffs asked W. Patrick Moriarty, called by them as an adverse witness, whether some of the Zebra contracts contained such a provision, counsel for defendants objected on the basis of the *Pennington-Noerr* rule referred to

4. In Thurston County, where plaintiffs were conducting their fireworks business, there was no similar prohibition in 1951 or in the immediately succeeding years.

above. The objection was overruled, and the witness answered in the affirmative.

The answer thus given over objection conveyed no information to the jury that was not otherwise before them in the contracts received in evidence without objection. Up to this point and regardless of the merits of defendants' legal position, we think no prejudice occurred. Very soon after this trial incident, counsel for plaintiffs asked Moriarity whether Zebra consulted an attorney and requested that he prepare a form of model ordinance. While defendants' objection to this question, made on the *Pennington-Noerr* ground, was overruled, the answer given to the question did not prejudice defendants because it was, "I don't know."

However, defendants also call attention to observations made by the trial judge in overruling this objection, and to the court's recital of plaintiffs' contentions at the close of the trial, asserting that they in effect invited the jury to disregard the *Pennington-Noerr* doctrine.

In overruling the objection referred to above the court made the following observation in the presence of the jury:

"I quite agree with you that the United Mine Workers case does not impose liability for lobbying activity, but I don't know that it goes so far as to approve a condition in a contract of sale that the merchandise will only be sold if they will agree to lobby, and that is what I understand he is trying to prove by this contract." [5]

In its instruction to the jury at the close of the case the court said the plaintiff contended that defendants

" * * * followed a policy or practice of suggesting a local implementing ordinance or resolution for cities and counties in the State of Washington containing a provision that the number of licenses to be issued by such city or county be limited to a specific number based upon the population of such city or county, and in most instances, signed a restrictive three year contract with prospective licensees prior to enactment of the ordinance while requiring that the prospective licensees assist in obtaining passage of the limiting ordinance or resolution."

If the quoted statements stood alone there would possibly be some basis for concluding that the jury might have been led to find Zebra liable because of its inclusion of the lobbying provision in some of its contracts with dealers. But these statements by the court did not stand alone.

The trial court advised the jury, both before reading plaintiffs' contentions, and after it had finished, that the contentions were disputed by defendants and were not to be considered as evidence. The trial court also gave the substance of defendants' requested instruction No. 22, when the court told the jury:

"Evidence has been introduced relating to efforts on the part of one or more of defendants and the alleged co-conspirators to influence public officials in the passage of fireworks legislation and in the issuance of licenses to sell fireworks. This evidence has been admitted for whatever light it may shed upon the purpose and character of the particular transactions and issues involved in this case. But I wish to emphasize, members of the jury, that efforts to influence public officials, sometimes called 'lobbying', do not violate the antitrust laws, even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme, itself violative of the antitrust laws."

This instruction clearly advised the jury that defendants should not be found liable because of any efforts they may have made to obtain favorable fireworks legislation. Thus, when it came to the submission of the case to the jury, the

---

5. Defendants also complain about somewhat similar remarks made by the trial court at later points in the trial. But none of these later remarks were made in the presence of the jury.

trial court gave full application to the *Pennington-Noerr* doctrine, even assuming that, under that doctrine, willingness to sell products to a dealer may be conditioned upon the dealer's agreement to assist in lobbying activities.

Defendants, having suffered an adverse verdict, now urge that this admonishment and this instruction were insufficient to cure either what they regard as erroneous observations made by the judge at earlier stages of the trial or the court's action in reading to the jury the indicated part of plaintiffs' contentions. However, they gave the trial court no indication at the trial, when further corrective measures could have been taken, that they were dissatisfied. Defendants at no time asked the trial court to retract the quoted observation it had made in overruling the objection to the question asked of Moriarty. Nor did they ask the court to omit from the statement of plaintiffs' contentions read to the jury the quoted portion pertaining to the contract provisions requiring lobbying activity by the dealers. In the absence of any other explanation for defendants' failure to seek curative measures at the trial, we are entitled to assume that, at the trial defendants did not consider the court's observation and instruction prejudicial or, if so, they believed the prejudice had been overcome by the quoted instruction No. 22.

We conclude that, if it be assumed that the *Pennington-Noerr* rule entitles a distributor to condition sales on the purchaser's agreement to engage in lobbying activity (a question we do not decide), any misconception the jury may have gained as a result of the described incidents was adequately cured by the admonishment and instruction referred to above.

Defendants also argue, however, that another trial court instruction errone- ously permitted the jury to award damages which could only have resulted from efforts to influence public officials.[6] It is apparent from their brief that defendants are here referring to the contract provisions requiring dealers in certain geographical areas to lobby, and are not referring to defendants' direct lobbying efforts.

Defendants did not object to the giving of this instruction insofar as it named Tacoma, Pierce County outside of the City of Tacoma, and Bremerton as areas where damages could be considered. They did not request any instruction limiting the areas where damages could be considered. Nor did they request any instruction limiting the area of damages to the areas where defendants had used their non-competitive agreements. Failure in a civil action to object to an instruction or to make a timely request for an instruction precludes review of the matter on appeal. Rule 51, Federal Rules of Civil Procedure; Bertrand v. Southern Pacific Company, 282 F.2d 569, 572 (9th Cir. 1960). While defendants rely upon Rule 46, Federal Rules of Civil Procedure, *Bertrand* indicates that Rule 46 does not undermine the requirements of Rule 51.

But, while defendants frame this particular argument as if it involved only the giving of an erroneous instruction, the substance of the argument also brings into question the sufficiency of the evidence to support a jury award based on defendants' activities in Tacoma, Pierce County outside of Tacoma, and Bremerton. One of defendants' grounds for moving for a directed verdict at the close of all the evidence was broad enough to present this question.

We conclude, however, that the evidence was sufficient in this regard, independent of the contract provisions

6. The instruction reads:
"In arriving at the amount of the award, you are limited to damages, if any, suffered by the plaintiffs because of lost profits from June 28, 1962 to July 6, 1967 in Tacoma. Pierce County outside of the City of Tacoma, Bremerton * * *; that is to say, profits which the plaintiffs would have made during such period in said place but for violation by defendants of the Federal antitrust laws."

relating to lobbying. We reach the same conclusion concerning defendants' challenge to the sufficiency of the evidence to support a damage award for the year 1962. This latter conclusion also calls for rejection of defendants' argument that the trial court erroneously instructed the jury that evidence permitting a damage award could be based upon defendants' 1962 activities.

Defendants contend that the trial court erred in giving the instruction, quoted in the margin, concerning alleged discriminatory pricing and discriminatory trade practices.[7] Defendants argue that the giving of this instruction was erroneous because: (1) there is no substantial evidence of any alleged discriminatory pricing or discriminatory trade practices; and (2) the instruction erroneously assumes that any such discrimination was necessarily illegal.

■ In our view, exhibit No. 341, consisting of a letter from Martin to Elizabeth Moriarty at Zebra, constitutes substantial evidence of discrimination. We do not believe the instruction "assumes" that any such discrimination was necessarily illegal. It refers to evidence of "alleged" discriminatory pricing and trade practices in violation of the antitrust laws. The word "alleged" qualifies not only the words "discriminatory pricing and discriminatory trade practices," but also the words "in violation of the antitrust laws."

Defendants contend that the trial court erroneously instructed the jury that the relevant area of effective competition was limited to the seven municipalities in which damages were claimed, and that it erroneously rejected evidence showing that the relevant market was statewide.

■ The rejected evidence consisted of maps of the State of Washington purporting to depict in different colors areas served by Zebra and its competitors. The reasons given by the court for excluding these maps are quoted below.[8] It will be observed that one of the reasons for rejecting these exhibits was that they were not a fair representation of what they purported to show. We are unable to say that the trial court abused its discretion in rejecting the evidence on that ground. We are therefore not called upon to decide whether the court erred in holding that these exhibits were not relevant.

■ With these exhibits excluded, there was apparently no evidence with respect to statewide competition, except the admitted fact that the five major fireworks wholesalers in the State of Washington were licensed to do, and did, business on a statewide basis. In keeping with plaintiffs' conception of the relevant market, as stated in their pretrial contentions, practically all of the evidence pertaining to competition related to the seven municipalities in which they assert they were damaged by defendants' alleged unlawful activities. Defendants did not, in pretrial proceedings, take issue with plaintiffs' definition of the relevant market or make any contention of their own concerning the relevant market. Under these circumstances we do not believe the trial court erred in limiting the relevant market in the respect described.

Defendants Martin and W. Patrick Moriarty contend that the district court erred in denying their motion for dismissal of the action as to them for failure to comply with the local rules concerning service of process.

7. "Now, the Court has admitted here evidence of alleged discriminatory pricing and discriminatory trade practices by the defendants in violation of the antitrust laws. You may consider this evidence in determining the presence or absence of a conspiracy or combination, as the Court has heretofore defined that term; but you may not consider it for any other purpose."

8. "I don't think there is sufficient showing to make the exhibits admissible, and I do not think that the exhibits are a fair representation or are relevant to the issues in this case, and I think they are extremely prejudicial."

Rule 20(c), Rules of the United States District Court, Western District of Washington, provides that the summons and complaint must be served within three months after the issuance of the summons. The rule further provides that unless a defendant has been served within that time period, or has appeared generally in the cause, or service on him has commenced pursuant to Rule 4(e), Federal Rules of Civil Procedure (service upon party outside of state), the action against him shall abate. Rule 20(c) also provides for the obtaining of orders extending the time to serve the summons and complaint.

The complaint in this action was filed on March 25, 1965. Summons was issued the same day, but service was not made upon Martin until August 24, 1965, nor upon Moriarty until March 13, 1967. In each case, therefore service was made in excess of three months after issuance of the summons. Plaintiffs at no time obtained an order extending their time to serve the summons and complaint. Martin and Moriarty urge that, under these circumstances, the action abated' as to them under the local rule and that the district court therefore erred in entering orders on January 19, 1967, and December 28, 1967, denying their motions to dismiss.

The order of January 19, 1967, dealt with a motion to dismiss for lack of jurisdiction filed by Martin, Moriarty and other defendants on November 30, 1966. In that motion Martin and Moriarty, did not seek dismissal because of abatement of the action under Local Rule 20(c). They sought dismissal on the ground that they were residents of other states and therefore beyond the jurisdiction of the district court and, in the case of Moriarty, on the additional ground that he had never been served with process.[9]

The order of December 28, 1967, denied the motion of all defendants to set aside the verdict, and the motion of Martin and Moriarty to dismiss as to them because of abatement under Local Rule 20(c). The latter motion is not a part of the record on appeal nor is it referred to in the docket entries. It was apparently presented about the same time as the motion to set aside the verdict, since the docket entries indicate that memoranda pertaining to the abatement problem were filed between November 2, when defendants filed their motion to set aside the verdict, and December 28, 1967, when that motion was denied. This was the first time that Martin and Moriarty asked for dismissal of the action as to them under Local Rule 20(c).

In rejecting this ground for dismissal as to Martin and Moriarty, the court held that the record as a whole indicates that they either waived the Rule 20(c) requirements, or are estopped from asserting them. In questioning this ground for denying their motion, these two defendants argue here that they made no voluntary appearance and urge that a party does not waive his objections by answering or going to trial on the merits after the objection is overruled.

▐ For the purpose of discussing this question it is immaterial whether Martin's and Moriarty's appearances were voluntary or involuntary. When

---

9. The order of January 19, 1967, rejected this latter ground on the merits, holding that Moriarty had voluntarily appeared in the lawsuit. The court held that the ground based on place of residence presented factual issues and that determination of the motion on that ground must await resolution of the facts. The relevant facts were resolved to the court's satisfaction in subsequent pretrial proceedings. Accordingly, on February 14, 1967, an order was entered denying in full the motion to dismiss, filed by Martin and Moriarty on November 30, 1966.

On June 8, 1967, Moriarty renewed his motion to dismiss on the ground that he was a California resident beyond the jurisdiction of the court and, as an additional ground, asserted that service of process was ineffectually made upon his fourteen-year-old daughter. Again, no contention was made that the action had abated under Local Rule 20(c). This motion was denied without prejudice on June 15, 1967.

they did appear, they were entitled to assert the defense, under Rule 12(b) (4), that the action should be dismissed as to them for insufficiency of process.[10] Under that rule they could have asserted this defense either by motion or by answer. Under Rule 12(b), however, if the defense is one which may be made by motion, it may be so made only if the motion is filed before pleading, if a further pleading is permitted. Moreover, Rule 12(g) provides that if a party makes a motion under Rule 12 and does not include therein all defenses and objections then available to him which the rule permits to be raised by motion, he shall not thereafter, with exceptions not here relevant, make a motion based on any of the defenses or objections so omitted.

■ Martin and Moriarty did not advance their Local Rule 20(c) defense in their answer, filed on July 6, 1967. Likewise in their Rule 12(b) motion filed prior to their answer, they did not offer that defense. As indicated above, they presented that defense for the first time after the jury returned its verdict on October 24, 1967. Accordingly, under the express terms of Rule 12(b) and (g) referred to above, they were foreclosed from seeking dismissal on the Local Rule 20(c) grounds.[11] The district court

therefore did not err in denying the motion to dismiss as to Martin and Moriarty under Local Rule 20(c).

■ United argues that the trial court erred in denying its motion for a directed verdict made, at the close of all the evidence, on the ground that all of the acts complained of by plaintiffs occurred prior to the formation of that defendant corporation. The United corporation was organized in 1962. The trial court denied this motion because of its view that there was substantial evidence from which the jury could infer that United joined the conspiracy after it was organized.

The legal premise for this conclusion, namely that one who joins a conspiracy after its formation is liable for all of the acts of the conspiracy, is not here questioned by defendants.[12] In our view, the court did not err in determining that the evidence in this respect was substantial.[13]

Defendants' final argument is that the award of damages is not supported by substantial evidence.

■ It is true, as defendants assert, that even where the defendant by his own wrong has prevented a more precise computation, the jury may not render a verdict based on speculation or

10. In order to do this it was not necessary for them to enter "special" appearances. Under federal practice a special appearance need not be filed in order to challenge jurisdiction. Dragor Shipping Corp. v. Union Tank Car Co., 378 F.2d 241, 243, n. 2 (9th Cir. 1967). This would be equally true in the case of a challenge to the sufficiency of process.

11. See United States v. Article of Drug, 362 F.2d 923, 926–927 (3rd Cir. 1966); Stavang v. American Potash and Chemical Corp., 344 F.2d 117 (5th Cir. 1965); 2 J. Moore, Federal Practice, ¶¶ 4.02(3), 12.12–12.13, 12.22–12.23 (2d Ed. 1969).

12. An instruction to that effect was given by the trial court, and United took no objection thereto. See Marino v. United States, 91 F.2d 691, 696 (9th Cir. 1937).

13. There was evidence indicating that United was connected to Zebra and Clipper

not only through the personal defendants but also by: a joint guarantee agreement for a $750,000 line of credit between United and Clipper; a total of $500,000 in loans between United, Clipper and Zebra; a United bank account which was managed by the Clipper California office; an arrangement whereby checks were forwarded from, and deposits were made in, California; a practice under which Zebra and United trade acceptances were issued by Clipper. In addition, exhibit No. 341 reveals that Martin, vice president of United, wrote to Elizabeth Moriarty, president of Zebra, advising how merchandise could be sold by United to Zebra at lower prices than to other customers without violating the Robinson-Patman Act. In that letter, Martin referred to all three defendant companies as "affiliated companies." See also, note 2, above.

guesswork.[14]  On the other hand, it is also established that in an antitrust action a plaintiff is not required to prove its damages with absolute mathematical accuracy,[15] and that an award of damages arising from exclusion from a market is not dependent upon showing a history of profit.[16]

Having in view these principles we conclude that the trial court did not err in holding that there was substantial evidence supporting the jury's $14,500 single-damage award.[17]

The judgment is affirmed.  The motion of appellees for additional attorneys' fees on appeal is denied.

14.  Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652 (1946).

15.  Volasco Products Co. v. Lloyd A. Fry Roofing Co., 308 F.2d 383, 392 (6th Cir. 1962).

16.  William Goldman Theatres, Inc. v. Loew's Inc., D.C., 69 F.Supp. 103, aff'd 164 F.2d 1021 (3rd Cir. 1948).

17.  The single-damage award was approximately twenty-seven percent of the single damages of $53,820 sought by plaintiffs.